[Civil No. 3745. Filed April 10, 1936.]

[56 Pac. (2d) 644.]

E. P. CARR, Plaintiff, v. ANA FROHMILLER, as Auditor of the State of Arizona, Defendant.

Mr. I. F. Wolpe, Jr., for Plaintiff.

Mrs. Ana Frohmiller, Defendant, *in pro. per.*

ROSS, J.—This proceeding in *mandamus* against Ana Frohmiller, state auditor, has for its purpose a judicial determination as to whether there are in the state treasury funds available to pay the burial expenses of a deceased old age pensioner.

The plaintiff shows by his complaint that he was employed for the sum of $100 by the board of supervisors of Maricopa county, acting as the old age pension commission of said county, to bury one Juana Gonzales, who died while holding a certificate entitling her to a pension from the county and state; that he prepared her body for burial, and buried her on January 17, 1936; that thereafter, on January 28th, he presented a claim of $67, that being the state's proportion of the burial expenses, to the state auditor, duly verified and properly approved by the said old age pension commission of the county, drawn against

the appropriation for old age pensions as made by chapter 34, Laws of 1933, for audit and allowance, and that the auditor refused to audit the claim or to draw her warrant therefor. It is alleged that there are sufficient unexpended and unencumbered funds in the state treasury appropriated by said chapter 34, and that plaintiff's claim is a legal charge against such fund.

The auditor's defense consists of a general demurrer and an answer; the latter being in the following words:

"Admits all the allegations of facts contained in Petitioner's Petition, and as an affirmative defense, alleges that the appropriation for old age pensions and burial expenses contained in subdivision 64 of the General Appropriation Bill for the present fiscal year, being chapter 107, Laws of 1935, has been expended for pensions and burials; that said appropriation is completely depleted and exhausted; that by operation of said General Appropriation Bill and the provisions of the Financial Code of Arizona, the continuing appropriation contained in chapter 34, Laws of 1933, was discontinued on July 1, 1935; that there is no appropriation of funds against which Respondent is authorized to draw a warrant in payment of Petitioner's claim."

From the answer, it appears that the refusal to audit and allow plaintiff's claim is not because there is no pension fund but because the legislative appropriation for the fiscal year 1935–1936 has been exhausted. Plaintiff alleges the existence in the state treasury of sufficient unexpended and unencumbered funds appropriated for the payment of his claim, and this allegation is not denied. Indeed, it is expressly admitted. Although it does not appear in the pleadings, the fact is the levy by the tax commission for pensions for the twenty-fourth fiscal year was $409,434.99. Because the question involved should be

settled as soon as possible, we will proceed as though this fact were pleaded.

Because it is anything but clear as to what action she should take, the auditor, we think very properly, declined to audit and allow the claim. Whether she was right in basing her refusal upon the fact that the amount set aside in the general appropriation bill for pensions (Laws 1935, chap. 107) was exhausted, is the question. In other words, it appears, as we shall show, that two appropriations for pensions for the twenty-fourth fiscal year have been made by the legislature, one under the Old Age Pension Act, and one in the general appropriation bill of 1935 (Laws 1935, chap. 107), and that the latter is exhausted, whereas there is a balance of approximately $125,000 in the former. This is because the levy and collection of taxes were made to meet the appropriation under the Old Age Pension Act or chapter 34, Laws of 1933. Whether these two legislative expressions can be reconciled or which one shall be accepted as the guiding rule and applied must be decided.

■ Chapter 34, Laws of 1933, is the Old Age Pension Act. Under it the board of supervisors of each county is made the old age pension commission of its county. The act is almost entirely administered by the county pension commission as agent of the county and state. Applications for pensions are passed upon and allowed or disallowed by the county pension commission. If allowed, the commission issues to the pensioner a certificate, good for one year, unless sooner revoked, which shall give the pensioner's name, age, residence and the amount of his monthly pension, which may be as much as, but cannot exceed, $30. The pension commission, upon awarding a pension, is required to certify the fact to

the state auditor, upon the blank prepared by the auditor, and also to the county treasurer of the county where the pensioner resides, and such certificate, until revoked, superseded, or nullified by expiration or death, is authority to the state auditor and the county treasurer to draw their monthly warrants in payment of pension in the proportion of 67 per cent. and 33 per cent., respectively, to be paid by the state out of its general fund and by the county out of its general fund.

Section 14 of the Pension Act reads:

"*Payment of Funeral Expenses.* Upon the death of a pensioner, the monthly instalment then accruing, with an additional amount to be fixed by the county commission, but not to exceed a total of one hundred dollars shall, if the estate of the deceased is insufficient for such purpose, be paid to such person or persons as the commission may direct, for the burial of the pensioner."

This section contains the only specific reference to funeral expenses. It does not provide who shall pay these expenses—whether the county or the state, or both. We think, however, since the pension for the month in which the pensioner dies is made a part of the funeral expenses, it is but reasonable to assume that it was intended by the legislature to be a joint obligation of the state and county in the proportion of 67 per cent. and 33 per cent., respectively.

Section 23 makes a continuing appropriation to cover the obligations authorized to be incurred under chapter 34. It reads:

"Sec. 23. *Appropriation.* The sum of twenty dollars per month to each pensioner under this act or so much thereof as may be necessary, is hereby appropriated out of the general fund of the state, to carry out the provisions of this act. The state auditor shall report to the state tax commission the

sum of all warrants issued hereunder, and the state tax commission shall include said sum in determining the annual tax levy.''

The appropriation is made ''to carry out the provisions of this act,'' and one such ''provision'' is that the county pension commission may incur expenses for the burial of the pensioner up to $100, if his estate is insufficient to care for such expense. Hence we think the appropriation was intended to cover both pensions and burial expenses.

It will be noted that section 23 provides that the state auditor shall report to the state tax commission ''the sum of all warrants issued'' under the act, and that ''the state tax commission shall include said sum in determining the annual tax levy.''

Section 3063, Revised Code of 1928, makes it the duty of the state tax commission, acting as a board of equalization, to ''fix the rate of taxation for state purposes to be levied and collected in each county.''

And section 3096, Id., provides the levy shall be for ''such a sum of money as the legislature may prescribe and deem to be sufficient. With other sources of revenue, to defray the necessary ordinary expenses of the state for each fiscal year or years, and to pay the interest and principal of the bonds of the state.''

Section 23, *supra,* was enacted quite a while after sections 3063 and 3096, *supra,* and it provides the rule to ascertain the ''annual tax levy'' for old age pensions. The state tax commission makes the levy, and it must in doing so include ''the sum of all warrants'' theretofore issued to old age pensioners. This, we assume, is what was done. The tax commission did not take the appropriation of $275,000 for 1935–1936 as the basis for fixing the rate of levy, but ''the sum of all warrants,'' and as a result there has been levied

and collected an excess over the appropriation contained in the general appropriation bill.

In refusing to make the rate of levy on the appropriation by the legislature for old age pensions and in fixing such rate on "the sum of all warrants issued," the tax commission strictly obeyed the law. The tax commission might and should have used the legislative appropriation as the basis for that purpose if the legislature had not directed it to use the rule prescribed by section 23 of chapter 34 as the basis of "the annual tax levy."

So we concluded that the money in the state treasury for old age pensions and funeral expenses, admitted by the answer to have gotten there under the provisions of the Old Age Pension Act, was levied and collected in pursuance of law and is available under the appropriation contained in section 23 to pay the plaintiff's claim for burial expenses of pensioner Gonzales, unless the legislation of 1935 in the general appropriation bill (Laws 1935, chap. 107) has superseded or repealed the authority of the tax commission to base its levy for old age pensions on "the sum of all warrants issued," and also suspended, superseded, or repealed the appropriation under chapter 34.

The defendant submits that such was the effect of the legislative appropriation, and it must be conceded that the answer to the proposition raised is not an easy one. The pertinent part of the general appropriation bill reads:

"Section 1. The following sums herein set forth are hereby appropriated for the fiscal years beginning July 1, 1935 and ending June 30, 1936, hereinafter designated as the 24th fiscal year . . . for the several purposes and objects as hereinafter specified, and the state auditor is hereby authorized and directed to draw warrants on the state treasurer to and

not to exceed the amounts herein set forth and for the purpose herein specified; and the state treasurer is hereby authorized and directed to pay said warrants out of the general fund of the state and the appropriation for the respective state agencies herein made. . . .

"Subdivision 64. *Old Age Pensions.*
For the 24th
Fiscal Year
"Pensions............$275,000.00."

Condensed, literally this means that the auditor shall not draw warrants for old age pensions for the twenty-fourth fiscal year for any sum above $275,000, and, since the defendant's answer is that this sum has been exhausted in paying pensions and burial expenses, the matter is at an end, unless such prohibition is treated as ineffective because of other provisions of the law.

It is a rule of construction that " 'a statute should be given effect according to its purpose manifested by its language and other rules of construction. The court is often not controlled by the literal language of the statute, but by its meaning when properly interpreted, though outside of such literal meaning. *City of Birmingham* v. *Southern Express Co.,* 164 Ala. 529, 51 So. 159. . . . ' *Nunez* v. *Borden,* 226 Ala. 381, 147 So. 166, 167." *Abramson* v. *Hard,* 229 Ala. 2, 155 So. 590, 593.

Also as said in 25 Ruling Case Law, 967, section 222:

"It often happens that the true intention of the lawmaking body, though obvious, is not expressed by the language employed in a statute when that language is given its literal meaning. In such cases, the carrying out of the legislative intention, which, as we have seen, is the prime and sole object of all rules of construction, can only be accomplished by departure from the literal interpretation of the lan-

guage employed. Hence, the courts are not always confined to the literal meaning of a statute; the real purpose and intent of the legislature will prevail over the literal import of the words. . . . ''

It should be remembered that we are not troubled with a lack of appropriation to pay pensions and burial expenses of pensioners; if anything, we have too much appropriation. In one breath and time the legislature has directed the tax commission to raise funds to pay each old age pensioner at the rate of $20 per month and in another breath and time has said only a portion of the fund thus levied and collected can be audited and paid out for pensions and burial expenses. If the levy and collection of taxes had been, as the legislature erroneously expected it would be, for a sum sufficient to meet the appropriation of $275,000, and no more, then there would exist an excuse for the prohibition directed at the auditor. But we will not ascribe to the legislature an intention or purpose to restrict the auditor to the auditing of claims only up to such appropriation when the fact situation shows the levy and collection to meet pensions and burial expenses were made under the Old Age Pension Act and amounted to more than $400,000 instead of $275,000.

We think it but right to assume that the legislature was trying to meet and take care of the obligations or charges created by the Pension Act and not some or a part of such charges and obligations, and that, if it had considered that the tax commission was compelled under the law to make the levy for old age pensions on the basis of ''the sum of all warrants issued,'' it would not have forbidden the auditor to audit and approve claims for pensions or burial expenses as long as the treasury had funds to pay such claims.

We should also take into consideration that the legislature by the Pension Act has divided the pecuniary obligations and charges for old age pensions and burial expenses between the county and the state in the proportion of 33 per cent. and 67 per cent.; that the auditor's authority to issue her warrant to cover such items is the certificate of the county pension commission, and that, if there are pension funds in the general fund, it is made her duty to issue her warrant. If we give effect to defendant's contention, we have this rather unique, not to say peculiar, situation: The county is required to raise and pay its proportion of the pensions and the state is not. In other words, the apportionment and appropriation contained in the Old Age Pension Act are in force as to the counties and superseded or suspended or repealed as to the state when the sum of $275,000 is exhausted.

The appropriation in the general appropriation bill is for a lump sum, and in and of itself means nothing. To make it intelligible, reference to the Old Age Pension Act is absolutely necessary.

That the legislature did not intend to supersede, suspend or repeal the appropriation in the Old Age Pension Act may be inferred from the fact that the appropriation in the general appropriation bill is for "pensions" or "old age pensions" only. There is no provision therein, as in the Old Age Pension Act, for burial expenses.

Another thing is obvious: Whatever pension funds there are in the state treasury for the twenty-fourth fiscal year did not get there on the basis of the appropriation for pensions in the general appropriation bill, but through the observance by the state tax commission of the provisions of the Old Age Pension Act. As a matter of fact, there was no levy or col-

lection of taxes to meet the appropriation of $275,000, although the taxes levied and collected were very much in excess thereof. As we have shown, the levy and collection of the taxes were made on the basis of "the sum of all warrants issued" under the Old Age Pension Act, and it could be only from such fund that the auditor has paid pensions and burial expenses during the fiscal year 1935–1936. The tax commission completely ignored the attempted limitation by the legislature (in the general appropriation bill) of the sum to be levied, and proceeded to make the levy according to the rule prescribed in the act (chapter 34, *supra*) creating old age pensions.

 If the legislature was of the opinion that the pensioners of the state were being paid too much and that the burden upon the taxpayers was too heavy, it should have changed the rule of the tax levy as prescribed in section 23 of the Pension Act. This it did not do. The rule that the rate of levy must be based on "the sum of all warrants issued" remains unchanged.

 The general appropriation bill is not "legislation" in the strict sense. Its object is to provide funds to meet previously authorized expenses of the government's different departments, offices, agencies and institutions. *Sellers* v. *Frohmiller,* 42 Ariz. 239, 24 Pac. (2d) 666. Chapter 34 provides for old age pensions and burial expenses for old age pensioners. It makes a continuing appropriation to care for them. There is no legal objection to continuing appropriations. We have so held many times.

 The pension money was levied and collected for the specific purpose and object of paying pensions and burial expenses of deceased pensioners. The administrative and executive officers of the state have collected such funds under a mandate of the legisla-

442

ture, and under our Constitution such funds cannot be expended for any other purpose.

"Section 3. . . . No tax shall be levied except in pursuance of law, and every law imposing a tax shall state distinctly the object of the tax, to which object only it shall be applied." Article 9, Constitution.

"Section 9. Every law which imposes, continues, or revives a tax shall distinctly state the tax and the objects for which it shall be applied; and it shall not be sufficient to refer to any other law to fix such tax or object." Article 9, Constitution.

While no doubt the legislature has the power and right to dispose of any balance left in the state treasury after the objects and purposes for which the taxes were levied and collected have been satisfied, and may direct that such balance be turned into the general fund, there is real, serious, fundamental objection to the legislature's levying and collecting taxes for a specific object and purpose and then prohibiting its expenditure for that purpose and letting it revert to the general fund. If the fund is not used to pay pensions and burial expenses, it will be discontinued at the end of 1935–1936, "and shall no longer be applicable to the purposes of the original appropriation." Section 2614 (Financial Code), Revised Code of 1928. We do not think the legislature has the power or right to thus defeat and set aside a provision of the state Constitution.

It is unquestioned that the legislature has the power to abolish or reduce or change old age pensions, but the proper way to manifest such intention would be by amending or repealing the Old Age Pension Act. The mere fixing of a maximum amount for old age pensions in the general appropriation bill cannot accomplish such purpose. The Old Age Pension Law would still exist, regardless of any such action. The reasoning of the court in *State* v. *Eg-*

*gers,* 36 Nev. 372, 136 Pac. 100, 101, where the question was what the effect of an appropriation in the general appropriation bill has on the substantive or general law, was as follows:

"These appropriation bills, as indicated by the titles, are passed for the support of the state government, and are not legislative acts changing the substantive or general laws of the state. The civil government of the state is established by the Constitution and general statutory provisions, and it is for the support of such government that general appropriation bills are enacted. It is not expected that changes and amendments in the general laws of the state will be made in general appropriation bills, and the life of such acts is only two years.

"Although failure to appropriate will prevent recovery from the state for traveling expenses, if the Legislature in the most explicit terms had designated in the general appropriation bill that the statute providing for the payment of traveling expenses for different officers should be repealed, or should be suspended for two years, such provisions or enactments would be void under section 17, article 4, of the Constitution, which provides: 'Each law enacted by the Legislature shall embrace but one subject, and matter properly connected therewith, which subject shall be briefly expressed in the title; and no law shall be revised or amended by reference to its title only; but, in such case, the act as revised, or section as amended, shall be re-enacted and published at length.'

"Any provision for the repeal or enactment of a law authorizing payment of the traveling expenses of an officer would not be germane to this act, which is entitled 'An act making appropriations for the support of the civil government of the state of Nevada for the years 1913 and 1914,' for the title does not indicate a purpose to repeal or amend any such existing law. *State* v. *Gibson,* 30 Nev. [353] 356, 96 Pac. 1057; *State* v. *Board of County Commrs. of Washoe County,* 22 Nev. 399, 41 Pac. 145; *State*

v. *Silver,* 9 Nev. [227] 231; *State ex rel. Chase* v. *Rogers,* 10 Nev. [250] 253, 21 Am. Rep. 738.

"Any act to suspend or amend one or more acts would not be effective unless the title of the amendatory act were pertinent; and if it were sought to amend two or more acts by one amendatory act, it would not be valid or amend any act to which the title of the amendatory act was not pertinent. *State* v. *Ah Sam,* 15 Nev. 27, 37 Am. Rep. 454; *Ex parte Hewlett,* 22 Nev. 333, 40 Pac. 96; *State* v. *Commissioners,* 22 Nev. 399, 41 Pac. 145; *State* v. *Hoadley,* 20 Nev. [317] 318, 22 Pac. 99."

Since our Constitution has provisions similar to those mentioned, the court's observations that the General Appropriation Act, because of certain fundamental reasons, cannot have the effect of amending or repealing or suspending a general law, are applicable here. In other words, none of the provisions of the Old Age Pension Act was repealed or suspended or superseded by the mere appropriation of $275,000 for pensions for the fiscal year 1935–1936.

If there is a repeal or suspension of any of the provisions of the Old Age Pension Act, it is by implication from the sole fact of a smaller appropriation for the twenty-fourth fiscal year for pensions than is provided for in such act. The Pension Act provides for a tax levy sufficient to pay each old age pensioner $20 per month, or so much thereof as may be necessary, the probable number of pensioners for the ensuing fiscal year to be arrived at on the basis of the sum of all warrants issued during the previous year. And the lump sum appropriation for the same year ignores such formula and arbitrarily fixes the sum for pensions at $275,000. The question is, Does this action on the part of the legislature have the effect of suspending or superseding the formula prescribed in the Old Age Pension

Act? It certainly does not either expressly or impliedly repeal such provision. Does it impliedly authorize the tax commission to adopt a different formula in making the annual tax levy for pensions? Concretely, can the tax commission disregard the probable number of pensioners for the ensuing year and the amount necessary to pay their pensions as provided in the Old Age Pension Act and make a levy on the equalized value of the property of the state at a rate sufficient to raise $275,000? If it can, the mere appropriation of the latter sum has a most devastating effect on the Old Age Pension Act. It amends such act by substituting for specific monthly pensions at a fixed rate a lump sum to be prorated among the pensioners on the basis of a reduced monthly pension, or it leaves the pensions and burial expenses unchanged and modifies the formula for the tax levy so that the sum to be collected will be inadequate to meet the pensions. In other words, by implication the whole structure of the Old Age Pension Act is changed by a mere appropriation.

For the various reasons herein assigned, we conclude that it is the duty of the state auditor to audit the plaintiff's claim and draw her warrant on the treasury therefor. The writ as prayed should issue.

McALISTER, J., concurs.

LOCKWOOD, C. J., Dissenting.—In reaching their conclusion as to the judgment which should be rendered in the instant case, the majority of the court have followed principles of constitutional law and statutory construction so widely different from that which I have always believed, and still believe, to be correct, that I am not only compelled to dissent from their conclusion, but to voice a protest against the principles thus approved. These principles, di-

vested of all camouflage and worded so simply that the veriest layman may understand their meaning and analyze their ultimate effect, may be stated as follows:

"When one legislature has adopted a project requiring for its operation a long period of time, and the raising and expenditure of large sums of money by the administrative officers of the government, and has made a continuing appropriation therefor, it is beyond the power of a later legislature to hamper or limit the execution of such project, or the right of the administrative officers to raise and spend such sums as appear necessary to carry it out to its fullest extent, by expressly and explicitly limiting the amount of money appropriated to carry out the project, and directing the administrative officers to spend the lesser amount, and no more, thereon, and such officers may and should disregard the later mandate of the legislature and raise and spend such money as may be necessary to carry out the project, in the manner and to the extent directed by the first legislature."

It seems to me that the falsity of this proposition is so obvious to any man who has made a study of our form of government and the constitutional power of the different branches thereof that it requires little explanation to point out wherein the error lies.

It has always been held, ever since the establishment of constitutional government in America, that the power to authorize and direct the expenditure of public money lies in the legislature and the legislature only, except as it may be affirmatively vested elsewhere by the Constitution. It has also been recognized as a fundamental constitutional principle that the mere approval by the legislature of any project requiring the spending of money, and providing in most explicit detail as to how that project shall be executed, and the granting of authority to the ad-

ministrative branch of the government to carry it out, does not authorize nor empower the latter to spend one penny of public money for any of those purposes unless and until the legislature, in addition to authorizing the project and directing how it shall be carried out, *has also appropriated money for that purpose,* and the amount of money which may be spent cannot be affected in any manner by the character of the project, nor the amount needed to execute it, but *solely by the amount which the legislative authority has said may be spent for that purpose,* regardless of whether it is sufficient to complete the project in whole or in part. I shall therefore waste no further space in endeavoring to show that the principles above stated are not and cannot be, under our system of government, constitutional and valid, but shall only point out wherein the decision of the majority, as applied to the present case, is necessarily based on those false and fallacious principles.

In 1933 our legislature adopted chapter 34 of the Session Laws of that year, which provided for the establishment of a system of old age pensions for the state of Arizona. The act contains twenty-four sections, and the first twenty-two set forth, in elaborate detail, the establishment of a county commission for the purpose of awarding old age pensions, the qualifications which must be possessed by all pensioners, the manner in which applications should be made and approved, the amount of the pension and its limit, and the method of payment thereof, together with a provision for cancellation and penalties for violation of the act. These sections, while containing a complete and workable system for old age pensions, did not of themselves provide for the expenditure of one penny of money from the state treasury, and, had the act stopped at that point, it would have been illegal

for any administrative officer of the state to pay any such pensions from the state treasury. In such a case, our old age pension act would have been in the same position as the Social Security Act recently adopted by Congress (42 U. S. C. A., §§ 1301–1305), for which no appropriation was made when it was passed. Like that act, our act could not have been effective unless and until money was appropriated to pay the expenses of carrying it out. The legislature, realizing that the act was but an idle gesture without any appropriation, then added section 23, which reads as follows:

"*Appropriation.* The sum of twenty dollars per month to each pensioner under this act or so much thereof as may be necessary, is hereby appropriated out of the general fund of the state, to carry out the provisions of this act. The state auditor shall report to the state tax commission the sum of all warrants issued hereunder, and the state tax commission shall include said sum in determining the annual tax levy."

Let us analyze the section to see just what legal effect it had. What are the requirements of an appropriation? They are: (a) A certain sum; (b) a certain object; and (c) the authority to spend. Nothing further is necessary or even germane thereto. Now all of these requirements are found in the first sentence of the section. The "certain sum" is "twenty dollars per month to each pensioner . . . or so much thereof as may be necessary." Since the name of each individual pensioner and the monthly amount of his pension must be certified to the auditor, under section 11 of the act, a mere mathematical computation will show the amount which may be spent, and "that is certain which can be made certain." The "certain object" is found in the words "to carry out the provisions of this act," while the "authority

to spend" appears in the language "is hereby appropriated." The last sentence of the section is obviously entirely unnecessary in order to make a valid and workable appropriation in the act.

But, it will be said, the legislature must have put the sentence in the act for some purpose, and it is our duty to ascertain and enforce that purpose. Quite true, so let us determine what the purpose could be. The sentence contains instructions to two state officers, as follows: (a) The auditor shall report to the tax commission "the sum of all warrants issued hereunder"; and (b) the tax commission "shall include said sum in determining the annual tax levy." Is this a necessary part of an *appropriation?* It can be neither "an authority to spend" nor "a certain object," for in no conceivable way could the language of the sentence be tortured into either meaning. There remains only the "certain sum." Now, if the "sum of all warrants issued hereunder" is the "certain sum" *which constitutes the appropriation,* or if it limits or affects that sum in any manner, the act is unworkable. It went into effect July 1, 1933. No warrants, of course, had been issued under it before that date, and none could be issued thereafter until the *amount of the appropriation was made certain* either by the legislature fixing it directly or by setting up a method by which it could be made certain. If "the sum of all warrants issued" was to affect the "certain sum" of the appropriation, since the "warrants issued" were then zero, the auditor's report to the tax commission must certify them as zero, and the "certain sum" which was the basis and limit of the appropriation and which the tax commission would include in its annual levy would necessarily also be zero, and this situation would continue *ad infinitum,* for zero multiplied by zero indefinitely

is still zero. The utter absurdity of imagining the second sentence of the section had anything to do with the amount or validity of the appropriation is so apparent that it is difficult to treat the suggestion seriously. The real purpose of the sentence is plain. It is merely a direction as to how the money required to meet the appropriation already made is to be raised. Since the number of pensioners fluctuates from time to time, it would, of course, be impossible for the tax commission, which makes its levy in August, to know exactly how much money would be needed to pay all pensions for that fiscal year until the end of the year. Two alternative methods for raising funds for that purpose were therefore possible. Either the commission might guess at the amount which would be necessary (based on what had actually been spent during the preceding year) and levy accordingly what it thought would be sufficient for the current year, or else the state treasury would advance the amount necessary to pay the warrants issued by virtue of the appropriation for the current year, and, the amount actually spent thus being definitely ascertained by June 30th of each year, the tax commission would, in the following August, make a levy sufficient to reimburse the treasury for what had been spent during the preceding fiscal year. Each of these plans has been used repeatedly by various legislatures when the precise amount necessary to raise to meet an appropriation could not be ascertained until after it was necessary to make the annual tax levy. It would appear that, since the language of the second sentence states that the amount levied should be exactly the amount for which warrants have previously been issued, it was not the intention of the legislature that the tax commission should make an estimate of what would be needed for the current

year, but rather that they should follow the second method of levying an amount sufficient to reimburse the treasury for what had previously been spent. But, be that as it may, under either theory the second sentence is and can be no part of the appropriation, but is merely a direction as to *how the levy to pay the appropriation shall be made.*

Since chapter 34 contained a continuing appropriation, as set forth in the first sentence of section 23, *supra,* and a method for raising the money to meet that appropriation in the second sentence thereof, no further appropriation from the legislature was necessary in order to carry on indefinitely. The auditor would draw her warrants, not to exceed $20 per month, for the pensioners certified to her under section 11 of the act, and at the end of each fiscal year she would report the amount of the appropriation spent by her during that year, whereupon the tax commission in the succeeding year would make a levy to reimburse the treasury for what had been spent. That this was the view of the Eleventh Legislature is shown by the fact that the general appropriation bill of that year (Laws 1933, chap. 95) made no appropriation whatever for old age pensions, and, as long as no further action was taken by the legislature, the act would continue self-executing and effective indefinitely.

The Twelfth Legislature, however, met some two years later. At this time it had the plenary authority which is held by every legislature, including the right to repeal, to modify, to alter, or to limit any act of any nature passed by the Eleventh Legislature, in any manner it might see fit, restrained only by the express provisions of the Constitution itself, for it must never be forgotten that, while all the other departments of state look to the Constitution for their

authority to act, the legislature looks to the Constitution only for limitations thereon. In other words, no officer of another department of government may do anything unless directly or impliedly authorized by the Constitution or laws passed in pursuance thereof, while the legislature has the full power of the Parliament of England, except as that power is limited by the express or implied provisions of the Constitution itself. The Twelfth Legislature evidently was satisfied with the general scheme of the Old Age Pension Law and the manner in which it should be carried out, for it made no changes therein; the method of awarding pensions was left the same; the method of making a levy reimbursing the treasury for any money expended by reason of the law was not altered. But, when it came to the question as to how much should be appropriated to carry out the terms of the law, that legislature spoke, and spoke explicitly and emphatically. The general appropriation bill of 1935 (Laws 1935, chap. 107) contained the following language:

"Section 1. The following sums herein set forth are hereby appropriated for the fiscal years beginning July 1, 1935 and ending June 30, 1936, hereinafter designated as the 24th fiscal year, and beginning July 1, 1936 and ending June 30, 1937, hereinafter designated as the 25th fiscal year, for the several purposes and objects as hereinafter specified, and the state auditor is hereby authorized and directed to draw warrants on the state treasurer to and not to exceed the amounts herein set forth and for the purpose herein specified; and the state treasurer is hereby authorized and directed to pay said warrants out of the general fund of the state and the appropriation for the respective state agencies herein made. . . .

"Subdivision 64. *Old Age Pensions.*

| | For the 24th Fiscal Year | For the 25th Fiscal Year |
|---|---|---|
| "Pensions | $275,000.00 | $275,000.00." |

This act which, of course, so far as it was constitutional, superseded *ipso facto* the terms of any acts or parts of acts of any previous legislature in conflict therewith, whether the earlier act was expressly repealed or modified or not, specifically provided an appropriation of $275,000, and no more, for the twenty-fourth and twenty-fifth fiscal years, respectively, for the purpose of the payment of old age pensions, and provided "the said auditor is hereby authorized and directed to draw warrants on the state treasurer to and not to exceed the amounts herein set forth and for the purpose herein specified." It seems to me it is impossible to frame language more definite and mandatory limiting the amount of warrants that the state auditor may draw for old age pensions during the twenty-fourth and twenty-fifth fiscal years to the sum of $275,000 for each year. In so far as the appropriating sentence of section 23, *supra,* is in conflict with this appropriation, it must necessarily fall. Is there a conflict? We must assume that the legislature had some purpose in placing in the general appropriation bill for 1935 an appropriation for old age pensions when it had not put one in the appropriation bill of 1933. There could be only one of two reasons for the change. The first is, that it believed the appropriation contained in chapter 34, *supra,* was not continuing in its nature, and that, in order to provide some money for the operation of the law, it was necessary for the legislature of 1935 to make a new appropriation. The second is, that it assumed that the appropriation in chapter 34 was continuing in its nature and ample to carry out the provisions of the act, as it clearly was, but that for some reason it determined to replace such appropriation by an appropriation limited to a specific sum and not fixed by the number of pensioners and the amount of pension granted by the

county commission. Any other reason for its conduct is inconceivable. But, no matter which purpose activated the legislature, the effect would be the same in either case. The appropriation of 1935 was substituted for the appropriation of 1933. If the Twelfth Legislature meant the appropriation of 1933 to continue, it was absurd and useless to place another appropriation for a different amount, determined in a different manner, within the general appropriation bill. If it did not wish the 1933 appropriation to continue, it was necessary to make a new appropriation. I see no escape from the conclusion that the appropriation contained in the appropriation bill of 1935 is, as a matter of constitutional law, a substitute for that contained in chapter 34, and was so intended by the legislature.

But it is urged that even the legislature may not constitutionally include general legislation in the general appropriation bill, and that the second sentence of section 23 could not be repealed by that bill. The general principle thus stated is quite true, and the second sentence of the section could not be, and was not, repealed by the appropriation bill of 1935. But what is the effect of that sentence? It does not make an appropriation in any manner. As I have pointed out, it merely directs the tax commission to reimburse the treasury for the amount actually spent for old age pensions by virtue of the appropriation for the preceding fiscal year by levying a tax therefor in a certain manner during the current fiscal year, and that is still the law. The auditor was authorized by the appropriation bill of 1935 to draw her warrants for old age pensions not in excess of $275,000 during the twenty-fourth fiscal year. That amount might or might not be sufficient to pay all the pensioners certified to her the full sums provided in the pensions

granted them, but that was not her business. The pension was not a vested right in any of the pensioners; that was a matter in the discretion of the legislature, and in the exercise of its legal discretion it told her that, although she might pay less, she could not pay more, than $275,000. At the end of the twenty-fourth fiscal year, it was her duty, under the last sentence of section 23, *supra,* to certify to the tax commission the amount of warrants she had issued. It was their duty, when they made the levy for the twenty-fifth fiscal year, to raise an amount sufficient to reimburse the treasury for the warrants thus paid, and no more. It seems to me from the language and citations found in the majority opinion that its signers have been misled by the fallacious idea that the second sentence of section 23, in some mysterious way beyond my power to understand, is a vital and inseparable part of the appropriation contained in the first sentence, and yet at the same time is substantive law which can neither be repealed by the general appropriation bill of 1935 nor left in force to raise the money to be spent by virtue of the appropriation contained in that bill.

It seems to me that I have demonstrated, beyond any reasonable possibility of contradiction, that the appropriation made by the legislature for the purpose of old age pensions at its session in 1935 was a substitute for the appropriation made by the previous legislature in chapter 34, *supra,* and that the necessary and inevitable effect of the 1935 appropriation, since it was in conflict with the one of 1933, was to repeal the latter. If this be true, the auditor could not issue more warrants after the later appropriation was exhausted.

I am heartily in sympathy with the principle of old age pensions, and I believe that, when a pension

of this kind has been established, it should be paid to those entitled thereto by law. But I think it should be paid in a legal, constitutional manner, by an appropriation made by that body which alone is vested with the authority to make appropriations, and that, if it has been mistaken in its judgment as to the amount needed, it ill becomes the administrative or judicial departments of the government to violate plain and fundamental constitutional principles in order to supply what the legislature has omitted, but what it can simply and easily provide upon the shortest notice, if it so desires.

In closing, I shall take a few moments to point out the appalling results which will be reached if the principles which the majority of the court has applied in this case are followed to their logical conclusion in succeeding cases which may and undoubtedly will, sooner or later, come before us. The contention has been made seriously that, when the legislature has imposed certain duties upon any public officer, and has appropriated a sum insufficient for him, in his opinion, to perform those duties properly, he may, without asking the consent of the legislature, spend such additional sums to carry out those duties as he may deem necessary, and that the auditor is bound to draw her warrant for those additional sums and the treasurer to pay them as there is money in the treasury. If this be true, the effect is to transfer the control of the purse from the legislative to the executive and judicial departments of the state government. The ordinary man, upon this last situation being suggested to him, would repudiate its constitutionality with indignation, and yet, if we are to apply the same principles as those necessarily used by the majority in reaching the conclusion which they have, this is the result which must inevitably be reached.

The old maxim that "the end justifies the means" has always been repudiated by every right thinking man, and yet, in the long run, it seems to me that the only excuse for the conclusion of the majority is that the end, to wit, that the old age pensioners should be paid without the necessity of calling the legislature into special session for the purpose of making a constitutional and legal appropriation therefor, is so important that it justifies what is, in my opinion, an unconstitutional administrative and judicial appropriation for that purpose by the other departments of the state government.