567 P.2d 1182

COCHISE COUNTY, Coconino County, Gila County, Graham County, Greenlee County, Maricopa County, Mohave County, Navajo County, Pinal County, Santa Cruz County, Yavapai County, and Yuma County, Bodies Politic and Corporate, Petitioners,

v.

Suzanne DANDOY, M.D., Director of the Department of Health Services and Department of Health Services, an Agency of the State of Arizona, John L. Huerta, Director of Department of Economic Security and Department of Economic Security, an Agency of the State of Arizona, Max Hawkins, Director of Department of Administration and Department of Administration, an Agency of the State of Arizona, and Bart Fleming, Treasurer of the State of Arizona, Respondents,

Pima County, Arizona, a political subdivision, and Pima County Board of Supervisors, Apache County, a political subdivision, Respondents/Intervenors.

No. 13232.

Supreme Court of Arizona, En Banc.

July 14, 1977.

Ryley, Carlock & Ralston by George Read Carlock and Joseph P. Ralston, Phoenix, for petitioners.

Bruce E. Babbitt, Atty. Gen. by Anthony B. Ching, Phoenix, for respondents Dandoy, Dept. of Health Services, John L. Huerta, Dept. of Economic Sec., Max Hawkins, and Dept. of Administration.

Divelbiss & Gage by G. David Gage, Phoenix, for respondent Bart Fleming, State Treasurer.

Stephen D. Neely, Pima County Atty. by Michael Lacey, Sp. Counsel, Bd. of Supervisors, Pima County, and Ronald M. Lehman, Deputy County Atty., Tucson, for respondent/intervenors.

Waterfall, Economidis, Caldwell & Hanshaw, P.C., Tuscon, Lynwood J. Evans, Tempe, John G. Balentine and William E. Morris, Tucson, Schmal & Wollschlager, Phoenix, for amici curiae.

HAYS, Justice.

Thirteen of the Arizona counties filed a petition for special action, asking this court to stay the action of the respondents in ordering the petitioners to budget and levy taxes for a July 1, 1977 implementation of the state's Medicaid program. Petitioners further asked that respondents be prohibited from expending state funds for the implementation or administration of the Medicaid program.

At the twelfth hour, Apache County asked to be dropped as a petitioner and permitted to appear with Pima County as an intervenor. Numerous legal aid and public legal services groups, along with religious, charitable, labor, and public social action organizations filed petitions to file briefs amicus curiae. The court granted the petitions to file briefs and the matter proceeded to oral argument. The court then accepted jurisdiction of the petition for special action.

The amicus curiae briefs in the main dealt with and emphasized policy rather than legal issues. One brief contained a well-annotated discussion of the history of Medicaid and its great contribution to the indigent poor. It is not the role of the court to determine the issues of this case on the merits or demerits of a highly controversial program. Our opinion neither approves nor condemns the Medicaid program concept.

As the last hold-out among the fifty states in accepting Medicaid, Arizona has found the path toward the program a halting process. In 1974 the "medical assistance program," known as Medicaid, was first enacted into law with effective dates for portions of the Act January 1 and October 1, 1975. Thereafter, in 1975, the Act was amended to postpone the effective dates for one year.

During the 1976 legislative session, the effective date for the program under A.R.S. Title 36 was again postponed; this time, to August 15, 1977. A.R.S. § 11–292.01, providing for the determination of the counties' share in the costs of the program, was also amended to become effective in 1977

upon the enactment of the general appropriation bill for the fiscal year 1977–1978.

In the 1977 legislative session a bill was passed repealing the Medicaid program, but the governor vetoed the legislation and the Senate failed to override the veto. The legislature, in the general appropriations bill, inserted footnotes prohibiting the use of appropriated funds by certain of the state departments, for any purpose related to the Medicaid program. The governor signed the general appropriation bill but by letter filed therewith indicated that these footnotes were invalid and unconstitutional.

Pursuant to the mandate of A.R.S. § 11–292, the respondent, Dandoy directed a letter to the board of supervisors of each of the fourteen counties ordering them to include in their annual budget and tax levy their share of the Medicaid program as determined by statutory formula. On or before the 15th day of each month, the county was ordered to pay 1/12th of its predetermined share into the medical assistance fund. From the foregoing, this special action resulted.

The petitioners, in their memorandum in support of the petition, raise the following issues:

1. Was an appropriation by the legislature of funds necessary to administer the Medicaid program a condition precedent to the implementation of the program?

2. Can the counties be required under the terms of the Medicaid Act to budget and levy for the Medicaid program?

Another issue was adverted to in petitioners' reply memorandum:

If the Medicaid law is at this stage self-executing without further legislative action being required, is there an excessive delegation of power to the respondent, Dandoy, which renders the Act unconstitutional?

The respondents filed a brief rebuttal memorandum. The court, however, considered the issue important enough to warrant additional consideration, and it ordered simultaneous filing of memoranda on the matter.

The petitioners, in support of their position on the first issue contending that the Medicaid program cannot be implemented without a legislative appropriation for administrative costs, cite Laws 1976, Ch. 132, § 4, which reads as follows:

"The hiring of staff necessary to provide medical assistance services as authorized by title 36, chapter 21, article 1, Arizona Revised Statutes, shall begin July 1, 1977 and shall be subject to legislative appropriation."

The legislature did not appropriate any funds for this purpose for the fiscal year 1977–1978. The appropriation of funds for the hiring of staff, urges the petitioners, is a condition precedent to the implementation of the program.

The respondents call petitioners' interpretation of section 4, *supra*, overly broad. They contend that if such interpretation is followed, the contemporaneous provisions for postponement were unnecessary and that this interpretation would effectively nullify the mandatory and unqualified language of A.R.S. §§ 11–292.01 and 36–2172(C). It is further urged that petitioners are advancing a "repeal by implication" argument. *State Land Dept. v. Tucson Rock & Sand Co.*, 107 Ariz. 74, 481 P.2d 867 (1971), and *State v. Rice*, 110 Ariz. 210, 516 P.2d 1222 (1973), are cited in support of this last assertion.

Respondents indicate that they view section 4, *supra*, as merely a minor fiscal measure prohibiting the expenditure of state funds for staff until funds are appropriated.

Respondents cite *Navajo Tribe v. Arizona Dept. of Admin.*, 111 Ariz. 279, 528 P.2d 623 (1974), for the proposition that the legislature's appropriations powers do not extend to funds originating from *federal and county sources.* Since it is proposed that staff hired to operate the Medicaid program will be paid out of federal and county funds (the medical assistance fund) the legislature's appropriation control alluded to in section 4, *supra*, cannot affect this action, argue the respondents.

As another argument, respondents cite cases holding that the appropriations process cannot be used for "legislation" purposes. *Carr v. Frohmiller*, 47 Ariz. 430, 56 P.2d 644 (1936); *Sellers v. Frohmiller*, 42 Ariz. 239, 24 P.2d 666 (1933); *Caldwell v. Board of Regents*, 54 Ariz. 404, 96 P.2d 401 (1939).

Finally, respondents contend that section 4, *supra*, violates the constitutional principle of separation of powers. In support of this position are cited *Ahearn v. Bailey*, 104 Ariz. 250, 451 P.2d 30 (1969), and *MacManus v. Love*, 179 Colo. 218, 499 P.2d 609 (1972).

■ We now discuss the merits of the opposing positions. In the first place, does the fact that section 4, *supra*, was included with other legislation postponing the effective date of the Medicaid legislation negate its terms? We think not. By legislating in this fashion, the legislature left its options open; if Medicaid was to proceed on the date set, appropriations could be made to provide for staff in numbers deemed adequate. Otherwise, implementation would await the working out of the problems with which the program was beset.

■ The "repeal by implication" argument has little merit because this was not truly a repeal but merely another postponement of which there had been two previously. Nor can we look on this provision as a minor fiscal measure, especially in view of the fact that nowhere in the basic legislation in § 36–2171 et seq. and § 11–292 et seq. are there any limitations on or standards set for the hiring of staff to implement Medicaid. Parenthetically, we also note that the amount and extent of administrative costs for the program is left to the unbridled discretion of the respondent, Dandoy. The hiring of staff is limited by the requirement that it be subject to legislative appropriation. Section 4, *supra*.

In citing *Navajo Tribe v. Arizona Dept. of Admin.*, *supra*, the respondents perhaps unconsciously extended the holding of that case. It does not stand for the proposition that the appropriations powers do not extend to funds originating from *federal and county sources*. From federal sources, yes. Nowhere in that opinion is there reference to funds raised by county taxation, and such a position is self-defeating because if county funds are not in the nature of state funds, the federal Medicaid grant will fail. *See* Exhibit E of Response to Special Action, a letter from the Department of Health, Education and Welfare dated June 2, 1977, addressed to Governor Castro. County funds must be equated with state funds or the federal contribution is lost.

■ We do not quarrel with the cases cited by respondents which hold that the appropriations process cannot be used for legislation purposes. However, there can be little doubt that unless the legislature provides the necessary funds, a program cannot function, and for the legislature to fail to provide the funds is not a use of the appropriations function for legislative purposes. The Arizona Supreme Court in *Eide v. Frohmiller*, 70 Ariz. 128, 216 P.2d 726 (1950), said:

". . . that until an appropriation is made by the state in accordance with the provisions of the act the administrative machinery provided for therein cannot function." 70 Ariz. at 135, 216 P.2d at 731.

Respondents argue that administrative costs for implementing and operating the Medicaid program have been provided. They cite A.R.S. § 36–2172(C), which reads as follows:

"C. The department of health services shall accept and receive any and all grants of money awarded to the state under the terms of title XIX of the social security act. All monies so received shall be deposited with the state treasurer in a special fund designated as the 'medical assistance fund' and shall be used exclusively for medical assistance and the administration thereof under the provisions of this chapter. All appropriated funds in any state agency which are eligible for federal matching under the program of medical assistance provided for in this section shall be transferred to and be considered a part of the medical assistance fund."

■ They hasten to add in their memorandum that the monies transferred to the medical assistance fund by operation of the foregoing statute will be used for medical assistance for the intended beneficiaries and not for hiring staff. Hence, the only source of funds to hire staff is the mix of county-raised money and federal money which all make up the medical assistance fund. We hold that section 4, *supra,* evidences a clear legislative intention that staff shall not be hired until funds are specifically appropriated by the legislature therefor.

As part of their argument that counties under the terms of the Medicaid Act cannot be required to budget and levy for medical assistance payments, petitioners urge that funds raised by the counties are to be used for "medical assistance" only. A.R.S. § 11–292.01 reads as follows:

"A. Beginning in the year 1977, on or before April 1 of each year or immediately after enactment of the general appropriations bill for the next fiscal year, whichever is later, the department of health services shall determine the amount to be obtained by each county during the next fiscal year for the state's medical assistance costs in the following manner:

"1. Determine the total medical assistance program costs, including federal and state costs, for the next fiscal year.

"2. Determine the non-federal share of the total amount determined pursuant to paragraph 1.

"3. From the total determined in paragraph 2, subtract state appropriated amounts eligible for federal matching funds under the medical assistance program and any other receipts for medical assistance anticipated by the department.

"4. Multiply the amount determined pursuant to paragraph 3 by the percentage that each county's assessed valuation bears to the state's assessed valuation for the current property tax year.

"B. The department shall notify each county board of supervisors of the amount determined in subsection A not later than April 1 or immediately after enactment of the general appropriations bill for the next fiscal year, whichever is later. Added Laws 1975, Ch. 141, § 7. As amended Laws 1976, Ch. 132, § 3."

■ However, we find no prohibition in the terms of the Medicaid statutes against the use of monies in the medical assistance fund for administration. Petitioners attempt to carry over the statutory definition of medical assistance [A.R.S. § 36–2171(3)] as a definition of medical assistance funds raised by the counties. In A.R.S. § 11–292.-01, quoted *supra,* the statute speaks of "total medical assistance program costs" and this term surely includes the element of administrative costs. Absent the provisions of section 4, *supra,* we find no bar to the expenditure of monies in the medical assistance fund for administration.

As we have heretofore indicated, the court was concerned with the constitutionality of the broad delegation of powers to the respondent, Dandoy. Our holding with regard to section 4, *supra,* is a basis for granting the relief requested by petitioners. However, in view of the fact that petitioners and respondents have briefed the issue, and if we were to avoid its determination now the matter would be before us again, we will determine the issue.

The petitioners contend that the subject statutes violate Article 3 of the Arizona Constitution which provides for the separation of powers of the three departments of government. They further urge that the statutes effectively delegate to an administrative agency the power to tax without imposing standards so that the method of ascertaining the amount of the tax can be determined by the administrative agency with mathematical certainty. *Duhame v. State Tax Commission,* 65 Ariz. 268, 179 P.2d 252 (1947); *Southern Pacific Co. v. Cochise County,* 92 Ariz. 395, 377 P.2d 770 (1963). Also cited is *Tillotson v. Frohmiller,* 34 Ariz. 394, 271 P. 867 (1928).

Petitioners also argue that there has been no valid appropriation of administration costs from the medical assistance fund. Numerous cases are cited in support of this

contention, including *Carr v. Frohmiller, supra,* and *Hunt v. Callaghan,* 32 Ariz. 235, 257 P. 648 (1927).

Respondents cite *Rochlin v. State,* 112 Ariz. 171, 540 P.2d 643 (1975), and earlier cases for the proposition that the court must be satisfied beyond a reasonable doubt in order to declare statutes unconstitutional. They further urge that social welfare and remedial legislation must be liberally construed. *State v. Sanner Contracting Co.,* 109 Ariz. 522, 514 P.2d 443 (1973).

Contending that the statutes set forth more than adequate standards and that the medical assistance fund is a special fund which does not require prior appropriations annually, respondents examine the provisions of the Medicaid statutes in some detail. As a final thrust, they indicate the provisions of the various federal regulations which set standards for participants in the Medicaid program. *See also* Title XIX of the Social Security Act (42 U.S.C. § 1396 et seq.). A.R.S. § 36–2180 is cited as providing that federal rules, regulations and standards shall preempt state law.

In further support of their position, respondents have attached to their pleadings as exhibits a copy of the state plan, a copy of the rules and regulations of the Health Services Department, and a copy of the pertinent federal regulations.

The respondents cite *Opinion of the Justices to the House of Representatives,* 333 N.E.2d 388 (Mass.1975), that the situation here is identical and that the Massachusetts court rejected a similar unlawful delegation challenge to their Medicaid program.

Proceeding to a determination of this matter, we are confronted with two arguments which of necessity cite many of the same cases and the same statutory language in support of two totally opposite positions. We readily agree with respondents that in the composite of Arizona Medicaid statutes, Health Service Department rules and regulations, the state Medicaid program plan, the federal statutes and regulations, many standards for the operation of the program have been set. Let us, however, zero in on the matter which first causes us concern: Where are there standards which tell us how the amount to be required for the Medicaid program in Arizona for 1977–1978 fiscal year has been determined? This amount by statutory formula in A.R.S. § 11–292.01, quoted *supra,* is determinative of what amount the counties shall include in their tax levies.

As we have previously indicated, the history of Medicaid in Arizona has been one of false starts and delay. This information and the following are, in part, gleaned from the briefs. At first, Arizona's plan for raising funds through county tax levy was totally rejected by the federal Health, Education and Welfare Department. As our earlier recital indicates, delays in the implementation were voted by the legislature as it wrestled with problems in developing a workable Medicaid plan. In 1975 the legislature created a joint legislative medical assistance committee. Laws 1975, Ch. 141, §§ 31–32. This committee, among other things, was empowered to ascertain facts and make recommendations to the legislature on public medical assistance and to determine the number of individuals and the current costs of health services in each county.

Also in 1975, the Department of Health Services was authorized to employ Arthur Young and Company to make a study and report on Arizona counties' expenditures for Indigent Health Care and the Medicaid cost projection for 1976–1977.

In 1976 the Senate adopted an amendment to HB 2110 which referred to the joint legislative medical assistance committee and the formula used in determining specific amounts to be contributed by each county for 1976–1977. The formula embodied aspects of the Arthur Young report. It is interesting to note that the county contributions determined by respondent Dandoy varied considerably from those set forth in the Senate amendment. Some were more and some were less; one varied more than five million dollars.

The Senate amendment failed passage in the House and was lost in conference com-

mittee. HB 2110 became law as we find it in Laws 1976, Ch. 132.

What is the significance of the foregoing? Why this reference to an amendment which never became law? Obviously the Senate in 1976 thought the legislature should make the determination as to the counties' contribution, and did in fact set forth some of the guidelines it used. Respondent Dandoy surely used some standards and some formula but these were not provided for or approved by legislative enactment.

The respondents have cited *Opinion of the Justices to the House of Representatives, supra*, as being identical to our case here. The following language belies that point:

". . . Rather the Legislature in determining the amount of the appropriation for c. 117, makes the critical choice with regard to the level of benefits. With whatever funds it has available, the department is charged with formulating 'the policies, procedures and rules necessary for the full and efficient implementation' of the GR program. . . ." 333 N.E.2d at 393–94.

■ The Massachusetts Supreme Judicial Court in other statements throughout their opinion indicate that the principal limitation on an administrative agency given broad powers to accomplish particular purposes is the appropriation. Under the scheme embodied in Arizona's Medicaid program, the administrator in effect sets the amount of the appropriation with only one standard or limitation, a sixty-million-dollar ceiling. This we hold to be unconstitutional.

Other issues have been raised by the parties, but in view of the foregoing we see no need to respond to them.

It is ordered that the stay heretofore entered is made permanent, and the respondents are prohibited from further actions implementing the Medicaid program as presently constituted.

CAMERON, C. J., and HOLOHAN, J., concur.

GORDON, Justice (dissenting):

I agree with the majority that it is not the role of this Court to determine the merits of Medicaid. Whether the medical assistance plan is good or bad from a philosophical or economic standpoint is just not the issue before this Court. The one and only issue before this Court is whether this plan, admittedly validly adopted and made law in Arizona by a majority of both of the houses of the Legislature of Arizona and approved by the Governor in 1974 is repealed because of the wording of Laws 1976, Chapter 132, § 4. Obviously, the two one-year delays and an aborted attempt to repeal the law show that later Legislatures had second thoughts or even changed their minds about Medicaid. The question, however, is whether the bill as enacted in 1974 imposes mandatory duties upon respondents to implement Medicaid or whether the roadblocks set up by the Legislature are legally effective to prevent implementation of the program. My reading of controlling Arizona case law forces me to disagree with the majority's conclusion that Laws 1976, Chapter 132, § 4 constitutes a condition precedent to the implementation of the Medicaid program. The majority's reasoning makes the "tail wag the dog." It allows the 1976 Legislature to do by implication and indirection what the 1977 Legislature was unable to do directly—repeal Medicaid.

An underlying principle in statutory interpretation is that a legislative act must be construed as a whole to give meaning and effect to all of its parts. *E. g., State Board of Technical Registration v. McDaniel*, 84 Ariz. 223, 326 P.2d 348 (1958). Thus § 4 must be read in the context of the entire Medicaid Act. Can this one small provision attached to a section postponing implementation of the program for another year negate the mandate of an entire legislative act?

The majority holds that § 4 "evidences a clear legislative intention that staff shall not be hired until funds are specifically appropriated by the legislature therefor." As a preliminary matter, I disagree that such an intention is clear. There are a

number of provisions of the Medicaid Act which explicitly and emphatically obligate respondents to implement Medicaid this year. If the Legislature wanted to modify those clear mandates, it could have placed in the statute itself a clear prohibition against implementation until specifically approved by the Legislature, as was done for mental retardation centers in A.R.S. § 36–558A.[1] Accordingly, § 4 could be read as respondents urge: no *state* funds are to be used for administration purposes until the Legislature appropriates therefor.

Much more importantly, however, the intent of the Legislature in § 4 is not the issue here. The issue is whether, even if so intended, § 4 can operate to block implementation of the Medicaid Act. No matter how strong or clear the legislative intent, that intent must be accomplished according to law before it can be effective. For example, and hypothetically, the Legislature could clearly intend a bill to be an emergency act which takes effect immediately. But if the emergency clause were omitted, this Court has no power to effectuate the legislative intent by supplying a non-existent paragraph.

The case law in Arizona as I read it is clear. This Court will, if reasonably possible, avoid interpretation of a statute to repeal by implication. *State Land Department v. Tucson Rock and Sand Co.*, 107 Ariz. 74, 481 P.2d 867 (1971). The majority argues their interpretation is in the nature of a postponement as was done twice previously rather than a repeal. The earlier postponements, however, were properly accomplished by extending the effective dates of all aspects of the Medicaid program. By contrast, § 4 as the majority reads it will accomplish through lack of specific appropriation for administrative costs just what the Legislature failed to do by legitimate means: repeal Medicaid. This it cannot do. *State of Arizona v. Angle*, 54 Ariz. 13, 91 P.2d 705 (1939); *State of Arizona v. Ash*, 53

Ariz. 197, 87 P.2d 270 (1939); *Carr v. Frohmiller*, 47 Ariz. 430, 56 P.2d 644 (1936).

Arizona case law is also clear that payment of funds into the state treasury does not necessarily vest the state with title to or control over those funds; custodial funds do not constitute state funds which can be appropriated by the Legislature. *Navajo Tribe v. Arizona Dept. of Administration*, 111 Ariz. 279, 528 P.2d 623 (1974). At the very least, this means the federal monies contributed to the Medicaid fund are not subject to legislative control and can be used for administration costs. *Accord, State ex rel. Sego v. Kirkpatrick*, 86 N.M. 359, 524 P.2d 975 (1974); *MacManus v. Love*, 179 Colo. 218, 499 P.2d 609 (1972).

The decisions of this Court I find most persuasive—indeed, dispositive on this issue—are those holding that the appropriation process cannot be used for legislative purposes. *Carr v. Frohmiller, supra; Caldwell v. Board of Regents, etc.*, 54 Ariz. 404, 96 P.2d 401 (1939); *Sellers v. Frohmiller*, 42 Ariz. 239, 24 P.2d 666 (1933). It is difficult to conceive of a situation more clearly analogous to the issue here than that of *Carr v. Frohmiller, supra*. In *Carr* the Legislature had enacted an Old Age Pension Act (OAPA) which set up a program to pay for pensions and burial of the indigent aged and also appropriated monies therefor. Two years later, in the general appropriations bill, the Legislature appropriated only $275,000 for old age pensions and forbade the State Treasurer to draw warrants for pensions or burials above this amount. Of course, under the OAPA there was appropriated an additional amount of money. This Court held that the Legislature could not, through the appropriation process, amend, repeal or suspend a general law (i. e., the OAPA). Under the Constitution the Legislature cannot use its appropriation power to prohibit the expenditure of money levied and collected under a valid statute. Since there was money in the treasury le-

---

1. A.R.S. § 36–558. *"Establishment and maintenance of centers.*

"A. In addition to the centers at Randolph and Tucson, the director may establish and maintain mental retardation centers at other locations throughout the state, subject to the availability of funds for such purpose and the approval of the legislature."

gally collected for the purpose of the OAPA, this Court ordered the Auditor to pay out these funds as directed by the OAPA, even though the amount appropriated in the general appropriations bill was exhausted.

The Medicaid situation is similar. The Legislature did not (successfully) amend or repeal the Medicaid Act. The Act clearly sets up a process whereby full funding goes into the State Treasury as the "Medicaid Fund." *Inter alia* A.R.S. §§ 11–292, 11–292.01. As the majority concedes, the money in the Medicaid Fund may be spent for administration costs, and therefore the Medicaid Act is self-executing; there is no need for a specific appropriation for administration expenses. As we ruled in *Carr* the Legislature, by the appropriation process (here, by failure to appropriate funds specifically for administration costs), cannot prohibit the proper expenditure of funds levied and collected under a valid statute.

Another way of viewing this problem is that attempts by the Legislature to prohibit the valid expenditure of properly levied and collected funds is a violation of the separation of powers doctrine, Article 3 of the Arizona Constitution. The Governor, through the Executive Branch, is charged with the duty to see that the laws are faithfully executed. *See*, e. g. *Ahearn v. Bailey*, 104 Ariz. 250, 451 P.2d 30 (1969). Respondents have acted according to the statutory mandate of the Medicaid Act. The attempt by the Legislature to use an appropriation restriction to interfere with the executive's duty to obey the statutory mandate is an unconstitutional encroachment upon the Executive Branch.

For the foregoing reasons, I have concluded that the Legislature has no power to prevent the implementation of a validly enacted program by using the method attempted in § 4.

The majority states that their holding with regard to § 4 is a basis for granting the relief requested by petitioners. Then by dicta they discuss the constitutionality of the delegation of power to respondents. These comments were clearly unnecessary by the majority's own words. I will follow the usual practice of this court and refrain from deciding an issue if it is unnecessary to the disposition of the case, particularly where the issue is the constitutionality of a statute. *Vigil v. Herman*, 102 Ariz. 31, 424 P.2d 159 (1967); *School Dist. No. 26 (Bouse Elem.) of Yuma County v. Strohm*, 106 Ariz. 7, 469 P.2d 826 (1970).

I respectfully dissent.

JAMES D. HATHAWAY, Judge, Court of Appeals, Division 2, concurs in the dissent.

Note: Vice Chief Justice FRED C. STRUCKMEYER, Jr., having disqualified himself from participation in this matter, The Hon. JAMES D. HATHAWAY, Judge of the Court of Appeals, Division Two, was called in to sit in his stead.