[Civ. No. 17657. Fourth Dist., Div. Two. June 17, 1977.]

ISABEL BELLINO, as Counselor, etc., Petitioner, v.
THE SUPERIOR COURT OF RIVERSIDE COUNTY, Respondent;
RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL
SERVICES et al., Real Parties in Interest.

[And four other cases.]*

---

*Horch v. Superior Court (Civ. No. 17658); Kiesz v. Superior Court (Civ. No. 17659); Kiesz v. Superior Court (Civ. No. 17660); Bellino v. Superior Court (Civ. No. 17661).

**COUNSEL**

Grobe & Bazar and Gerald M. Bazar for Petitioners.

Ray T. Sullivan, Jr., County Counsel, Joel Brand and Jerry A. Scheer, Deputy County Counsel, for Respondent and for Real Party in Interest Department of Public Social Services.

No appearance for Real Parties in Interest Minors.

**OPINION**

**McDANIEL, J.**—This is a consolidation of five writ proceedings which present two interrelated issues: (1) whether the County has the responsibility to initiate wardship proceedings for abandoned developmentally disabled minors and (2) whether the juvenile court has jurisdiction to determine the merits of applications to establish court dependencies for such minors.

In each of the five cases, a counselor with the Inland Counties Developmental Disabilities Services filed an "Application for Juvenile Court Petition," requesting the Riverside County Department of Public Social Services (Department) to commence proceedings to establish

court dependencies for the developmentally disabled minors all of whom have been abandoned by their respective parents. Over three weeks then elapsed during which the probation officer, acting for the Department, did not file the requested petitions. (If the probation officer does not file a petition within 21 days after the application is made, the probation officer shall notify the applicant of the decision not to proceed further and the reasons therefor. (See Welf. & Inst. Code, § 653.))

The counselors then filed an "Application to Juvenile Court to Review Decision of Probation Officer." The application was denied by the juvenile court in October 1976; in November, the court issued identical "final orders" denying each of the applications. In each final order, the court explained the reasoning behind the denial: although the applications made a sufficient prima facie showing to cause the court to order the Department to commence juvenile court proceedings, the court concluded, because of certain statutes, that the Department was not responsible for instituting such proceedings for a developmentally disabled minor. Therefore, the court declined to rule on the merits of the applications.

The counselors then filed petitions for writs of mandate seeking to compel respondent Riverside County Superior Court to "exercise its discretion to determine said Application[s] on [their] merits and to order the Real Party in Interest to commence proceedings in the Juvenile Court as prayed for in said Application[s]." We granted alternative writs requiring the respondent superior court to exercise its discretion by reviewing the petitioners' applications, and to order the real party in interest (Department) to commence proceedings in juvenile court, or, in the alternative, to show cause why it should not do so.

The respondent and real party demurred in this court to the petitions for writs of mandate on the ground that the superior court had no jurisdiction of the subject matter. The respondent and the real party (hereinafter County) also filed answers to each of the said petitions in which County stated as an affirmative defense that the superior court is without jurisdiction to decide the petitions herein on their merits.

We begin by summarily disposing of the demurrer. ■ Although one may file a demurrer to a petition for a writ of mandate (Code Civ. Proc., § 1069.1), the ground alleged by the County (that the superior court has no jurisdiction over the subject matter of this action) is not one which is proper for the type of proceeding before us. As petitioners point

out, even if, solely for the purposes of argument, the superior court does not have jurisdiction, nevertheless this court has original jurisdiction to determine the merits of a petition for writ of mandate. (See 1 Witkin, Cal. Procedure (2d ed. 1970) Jurisdiction, § 17, pp. 543-544.) Therefore, the demurrer is overruled.

■ We turn now to the central issues of this proceeding: (1) whether the County has the responsibility to initiate wardship proceedings for abandoned developmentally disabled minors and (2) whether the juvenile court has jurisdiction to determine the merits of applications to establish court dependencies for them.

The County contends that the state, not the County, has the responsibility to initiate wardship proceedings in this case, and therefore, the juvenile court has no authority to establish the dependencies sought by petitioners. The County asserts that the legislative "scheme" contemplates that developmentally disabled minors be cared for "through a different agency than the Juvenile Court system" and, in support of this position, cites Health and Safety Code sections 416-416.23 and 38000-38500 which provide for guardianships for developmentally disabled minors to be established by the State Director of Health. The County further directs us to an Attorney General's opinion written in September 1975 which addresses the issues before us. After analyzing the Welfare and Institutions Code statutes providing for wardship proceedings and the applicable Health and Safety Code provisions, the Attorney General concluded that, under the latter code, the Director of the State Department of Health, acting through the state regional centers, "has the initial responsibility for instituting the proceedings involving developmentally disabled minors." (58 Ops.Cal.Atty.Gen. 688, 689 (1975).)

Petitioners argue that the Attorney General's opinion is incorrect and we agree. The declared basis for the opinion is "the principle of statutory construction holding that a special statute dealing with a particular subject controls and takes priority over a general statute touching the same subject. [Citations.]" (*Id.*) Thus, the Attorney General concluded that the "special" statutes dealing specifically with developmentally disabled persons (Health & Saf. Code, §§ 416-416.95, 38000 et seq.) control and take priority over the wardship provisions of Welfare and Institutions Code section 600 (now § 300) which apply to any person under 18 who, for a variety of reasons, may be adjudged a dependent child of the court.

In contrast to the Attorney General's anaylsis, we believe that the statutes in question may be interpreted to be mutually supportive. We turn first to an examination of the Health and Safety Code provisions which provide for conservatorship and guardianship proceedings for developmentally disabled persons. These statutes were enacted to relieve parents of their concern over who would take care of their developmentally disabled child when the parents are no longer able to fulfill that function. As noted in a law review article discussing these sections, the statutes were designed to respond to the " 'poignant and challenging question . . . of the parent: "What will happen to my retarded child when I am no longer able to care for him?" ' " (60 Cal.L.Rev. 438, 510.) Consequently, it is not surprising that the policy of the State Department of Public Health is *"to refuse to accept appointment as public guardian while a parent or guardian is still alive.* This policy is based on the belief that the parents should continue to participate in the planning for their retarded children so long as they are alive and able." (6 U.C. Davis L.Rev. 40, 53; see also 60 Cal.L.Rev. 438, 510; italics added.) In its points and authorities, County concedes that the state will refuse to act under Health and Safety Code section 416 et seq. (i.e., will refuse to initiate guardianship proceedings), where a parent of the developmentally disabled minor is still alive.

Turning to the five petitions before us, we note that the situation in each differs radically from that which apparently inspired the enactment of the pertinent Health and Safety Code provisions. Here we are *not* dealing with mentally retarded children whose parents have continued to care and provide for them. Rather, we are dealing with developmentally disabled children who have been abandoned by their yet living parents. Health and Safety Code section 416.23 specifies that article 7.5 of that code ("Conservatorship and Guardianship for Developmentally Disabled Persons") "does not authorize the care, treatment, or supervision or any control over any developmentally disabled person *without the written consent of his parent or guardian."* (Italics added.) Consequently, if we followed the County's logic that only the State Director of Health can institute proceedings for these minors, the state could conceivably and legitimately balk at doing so because the parents who had abandoned these youngsters had not, prior to abandonment, given their written consent for the state's caring for, treating, supervising or controlling the minors. As a result, what entity could then step in to assist these minors when, for example, because of their many and varied medical problems, they require medical attention? The only possible answer would be the Department's contacting the juvenile court for authorization for medical

treatment each and every time the minor needed it. Consequently, we do not view the Health and Safety Code provisions as being more specific than the applicable Welfare and Institutions Code provisions and thus superseding them. Rather, we view the two codes as harmoniously coexisting—the former to protect the developmentally disabled person when his caring parent dies or consents, in writing, to the state's exercising control over him, while, as will be demonstrated, the latter covers the situation before us.

Welfare and Institutions Code section 300 (formerly § 600) provides in relevant part that "[a]ny person under the age of 18 years who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge such person to be a dependent child of the court: [¶] (a) Who is in need of proper and effective parental care or control . . . or has no parent or guardian willing to exercise or capable of exercising such care or control, or has no parent or guardian actually exercising such care or control. . . ." Obviously, the developmentally disabled minors here who have been abandoned by their parents would come within the ambit of section 300: they are under 18 and, because of their severe medical problems, are in need of a responsible entity to care for them.[1]

We next turn to a summary discussion of the remaining points raised by the County. First, County notes that under juvenile court law, there is no provision for the management of the estate of a developmentally disabled minor. We need only note that we are not here concerned with the management of the minors' estates but, rather, are concerned with the youngsters obtaining medical treatment.

County next asserts that using the juvenile court to assist these five minors would be a drastic step in that the child would then "have a juvenile court record which can be detrimental as the public does not distinguish between the dependent child and the ward of the Juvenile Court." All we need say to this spurious contention is that the code clearly distinguishes between section 300 and section 601 proceedings. Moreover, County has not made it clear how these children are going to be prejudiced by using the juvenile court law to aid and assist them.

---

[1] While this matter was pending before us, Robert Tony D. (4 Civil 17657) turned 18. Of course, because of his age, he is no longer eligible for assistance under juvenile court law.

■ The County next cites Health and Safety Code section 38223 which provides that the director of a regional center may give consent to medical treatment for a regional center client and that, by using the juvenile court law rather than the Health and Safety Code provisions, we would be depriving the child of this assistance. We do not agree. Under Welfare and Institutions Code section 727, the juvenile court "may make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of such minor, *including medical treatment,* subject to further order of the court." (Italics added.) Presumably, this provision would give the juvenile court the authority to assign the minor to a regional center if the court deemed such placement appropriate.

The County additionally points to its having the expense of maintaining the child if the juvenile court takes jurisdiction of him. Petitioners refute this allegation. ■ Without getting into which entity would be financially responsible for which expense, suffice it to say that where a governmental entity has a mandatory duty to act, the excuse that it cannot afford to do so is unavailing. (*City and County of San Francisco* v. *Superior Court,* 57 Cal.App.3d 44, 47 [128 Cal.Rptr. 712].)

Let the writs of mandate issue directing the superior court to review the merits of the petitioners' applications (except in 4 Civil 17657, see fn. 1 *ante*) wherein they requested the Department to commence wardship proceedings in juvenile court on behalf of the minors.

Kaufman, J., concurred.

**GARDNER, P. J.**—I concur in the order that writs of mandate issue directing the superior court to review the merits of petitioners' applications wherein they request the Department to commence wardship proceedings in juvenile hall on behalf of these minors.

However, I would like to stake out our position with some specificity. The above is all we are doing. We are simply holding that these or any other abandoned children come within the jurisdiction of the juvenile court under Welfare & Institutions Code section 300 et seq.

However, these cases are but the preliminary event. The main event is to follow. That main event is a fight over money—a fight between the county and the state as to just which entity has the financial responsibility for the care of these unfortunate youngsters. That matter will probably come before us as a result of some kind of litigation between the state

and the county. I just want to make crystal clear that the discussion in our opinion of the responsibility between these two entities refers only to those issues as confined to our basic determination in regard to the responsibility of the juvenile court. I don't want any party coming in later and claiming law of the case based on anything said in our opinion. We don't even have the proper parties before us. All we have are some unfortunate children who desperately need the services of a juvenile court pending the big battle between the state and the county as to just who is responsible for their care and maintenance.