775 P.2d 521

Charles ARNOLD, Maricopa County Public Fiduciary, as guardian and next friend on behalf of John Goss; Nancy E. Elliston, as guardian, conservator and next friend on behalf of Clifton Dorsett and as next friend on behalf of Richard Schachterle and Susan Sitko; Terry Burch; and on behalf of all others similarly situated, Plaintiffs–Appellees,

v.

ARIZONA DEPARTMENT OF HEALTH SERVICES, Arizona State Hospital, and Maricopa County Board of Supervisors, Defendants–Appellants.

No. CV 87–0454–T/AP.

Supreme Court of Arizona, En Banc.

March 13, 1989.

594

Robert K. Corbin, Atty. Gen. by Anthony B. Ching, Sol. Gen., and Robert A. Zumoff, Asst. Atty. Gen., Phoenix, for State defendants-appellants.

Tom Collins, former Maricopa County Atty. by Gordon J. Goodnow, Jr. and Mariannina E. Preston, Deputy County Attys., Phoenix, for defendant-appellant Maricopa County.

Brown & Bain by Amy J. Gittler (formerly Director of Arizona Center for Law in the Public Interest) and Arizona Center for Law in the Public Interest by Tannis Fox, Phoenix, for plaintiffs-appellees.

Mental Health Law Project by Arlene S. Kanter, Washington, D.C., for amici curiae.

SARAH D. GRANT, Court of Appeals Judge, Department D.

## I. PREFATORY STATEMENT

The issue presented is whether the state legislature, through various statutes, has mandated that state and county governments provide mental health care to the chronically mentally ill and whether those governments have breached that statutory duty.

We do not here consider any common law duty or obligation of the state or county to care for the chronically mentally ill but only construe the statutes by which the legislature has declared such a duty. Nor do we deal here with the question of funding. The legislature must fund whatever programs it has required and we are not presented with and do not answer the question of what happens if the legislature fails to do so.

The legislature may determine how government will interact with the governed. The constitution and the legislature set forth duties the state and counties have to the people. The legislature may create different duties based on differing needs of parts of the population. In Arizona, as is true elsewhere, a portion of the population is chronically mentally ill. The legislature's response to the particular needs of this portion of our population is the subject of this case.

We write today from the bottom rung of the ladder. The record before us demonstrates that Arizona is last among the states of this union in providing care and treatment for its indigent chronically mentally ill.[1] This is the first case in the nation in which a trial court has ordered broad and all-encompassing relief for the CMI under a comprehensive state statutory design. The Director of the Arizona Department of Health Services (DHS), the Superintendent of the Arizona State Hospital (ASH), and the Maricopa County Board of Supervisors (the County) sought review in the court of appeals of the trial court's order to create a unified, cohesive, and well-integrated system of community health services for the CMI as mandated by Arizona health care statutes. This court accepted transfer of this appeal from the court of appeals, Division 1, at the request of that court pursuant to Rule 19(a)(3), Ariz.R.Civ.App.P., 17B A.R.S. This court has jurisdiction of this appeal pursuant to Rule 8, Ariz.R.P.Sp.Act, and A.R.S. § 12-2101. We affirm the orders of the trial court.

## II. PROCEDURAL HISTORY

On March 26, 1981, the Arizona Center for Law in the Public Interest (the Center) filed this action on behalf of five chronically mentally ill individuals. The named plaintiffs—John Goss, Clifton Dorsett, Richard Schachterle, Susan Sitko and Terry Burch—alleged that the state and county defendants failed to provide them and a class of similarly situated CMI individuals with adequate community mental health

1. We shall use the parties' abbreviation for the plaintiff class: CMI.

services. The complaint sought relief under federal law, special action relief in the nature of mandamus pursuant to the Rules of Procedure for Special Actions, 17A A.R.S., and declaratory relief pursuant to A.R.S. § 12–1831 *et seq.* The trial court dismissed the federal claims upon the defendants' motion. On December 1, 1982, it certified the lawsuit as a class action pursuant to Rule 23(b)(2), Ariz.R.Civ.P., 17 A.R.S. The case was tried to the court. On January 16, 1985, following post-trial briefing, the trial court determined that the plaintiffs were entitled to judgment. On June 24, 1985, the trial court signed an order including findings of fact and conclusions of law. Following an evidentiary hearing, the trial court ordered the defendants to pay costs and attorney's fees. A judgment was entered on August 1, 1986. The defendants appealed.

### III. THE CHRONICALLY MENTALLY ILL

A.R.S. § 36–550(3) describes the CMI as: [p]ersons, who as a result of a mental disorder as defined in § 36–501, paragraph 20, exhibit emotional or behavioral functioning which is so impaired as to interfere substantially with their capacity to remain in the community without supportive treatment or services of a long-term or indefinite duration. In these persons mental disability is severe and persistent, resulting in a long-term limitation of their functional capacities for primary activities of daily living such as interpersonal relationships, homemaking, self-care, employment and recreation.

According to the record chronic mental illness is an incurable illness, although attempts are made to manage it. This illness is characterized by an acute or psychotic phase and a residual phase. A patient in the psychotic phase often suffers hallucinations and delusions and exhibits bizarre behavior. A patient in the residual phase acts less bizarre, but is still unusually vulnerable to stress, which may cause a rever-

sion to the psychotic phase. The residual stage patient is also very dependent, has difficulty relating to others and lacks skills needed for everyday living. The CMI are people whose emotional or behavioral functioning is so impaired as a result of mental illness that they cannot live in society without treatment and economic assistance for an indefinite length of time—often for the remainder of their lives. A.R.S. § 36–550(3). An estimated 4,500 CMI persons reside in Maricopa County. The Center's expert, Dr. Leonard Stein, estimates that only 10 to 15 percent of the CMI could be economically self-sufficient, even when receiving appropriate treatment in the community.

The record contains a thorough history of the treatment of chronic mental illness. According to Dr. Stein, the CMI first encountered problems receiving treatment in the United States in the mid-nineteenth century after the great wave of immigration from Europe. This over-taxed the limited resources available to care for the CMI, further compounded by the fact that no one had the legal responsibility for them. In response to this problem, social crusader Dorothea Dix lobbied for the creation of state hospitals for the mentally ill. As a result of her efforts, the state hospital system in this country began in the mid-nineteenth century.

Most CMI, including those in Arizona, were institutionalized in state hospitals until the mid-twentieth century. ASH reached its peak population in the early 1960's at 1,750 patients. Beginning in 1953, increased usage of psychotropic[2] medication, which was effective in controlling the acute psychotic phase of chronic mental illness, allowed mental health institutions to release the CMI into the community. Outplacing of patients into the community, considered the first half of deinstitutionalization, accelerated during the 1960's and 1970's. *See Westwood Homeowners' Ass'n v. Tenhoff,* 155 Ariz. 229, 231, 745 P.2d 976, 978 (App.1987), *review*

**2.** Psychotropic is defined as "exerting an effect upon the mind; capable of modifying mental activity." *Dorland's Illustrated Medical Dictionary* (25th ed.1974).

*granted* Dec. 15, 1987. The census at ASH dropped from 1,750 in 1962 to 450 in 1984.

The second half of deinstitutionalization was the creation of a comprehensive, community-based system of care—a system that never really developed in most of the country. The parties to this lawsuit agree that the main elements of such a system should include a full continuum of care: medications, case management, day treatment, crisis stabilization, transportation, residential services, work adjustment, socialization, recreation, outreach, and mobile crises services. Because the psychotropic medications used to control the acute or psychotic phase of the illness are not at all effective in treating the residual impairments, the residual phase must be controlled through social skills training, case management, outreach and other modalities. Like many other major illnesses such as diabetes, cancer, high blood pressure and heart disease, chronic mental illness is not cured by any treatment, but it can be effectively managed. Non-compliance with treatment is a frequent symptom of chronic mental illness but is not an indicator that a CMI person would not benefit from appropriate mental health services.

## IV. THE CLASS

The class consists of approximately 4,500 indigent CMI residents of Maricopa County who could reasonably benefit from appropriate medical services. All named plaintiffs are members of the class.

## V. THE NAMED PLAINTIFFS

### TERRY BURCH

Terry Burch, a high school and junior college graduate, has a long history of mental illness. His first psychotic episode occurred at 17. In his mid–30s at the time of trial, Burch is regarded as a classic casualty of an inadequate mental health care system.

His afflictions are legion. He has had problems with drugs and alcohol and has attempted suicide many times. He has sometimes lived on the street. Doctors diagnosed him as having a bipolar disorder,

of the manic-depressive and schizo-affective type. Manifestations of his illness include poor judgment, insensitivity, impulsivity, and bizarre or socially unacceptable behavior such as making threatening arm movements (similar to karate moves). He also has frequent, severe, and uncontrollable episodes of destructive acting out, euphoria, and grandiosity.

Burch's illness causes him to deny the affliction and essentially oppose the entire medical system. As a result, his history indicates that he has repeatedly rejected offered treatments, perhaps because of negative side effects. Despite this, county and state officials continued their efforts to get Burch into self-motivated treatment programs.

At one point, he was found to be a danger to himself and was hospitalized at ASH for several months. When he was ready for discharge, ASH staff attempted to find an opening for him at a community residential facility. Because of delays, an opening at such a facility was filled by another patient. Burch subsequently discharged himself against medical advice and went to a boarding home. One expert witness testified that Burch could do much better than wandering the streets. At the time of trial, Burch was receiving Social Security payments and living in a boarding home.

### SUSAN SITKO

Susan Sitko is a college graduate fluent in Spanish, French and English. She taught French and worked as a librarian in Pennsylvania. After suffering psychiatric problems in Pennsylvania, she moved to Arizona to live with an aunt. Like Terry Burch, Sitko suffers from a bipolar disorder.

Her talents and potential were obvious to her doctor and guardian. In conversations she would switch among her three languages with ease. She wrote lucid and coherent poetry. She had a long-term relationship with a boyfriend and was involved with a church. Her problems, however, were also obvious. Her thoughts were often disjointed, making conversation difficult. She often thought she had polio and

would assume a twisted posture. Sitko was hospitalized at ASH at one point and upon discharge received a variety of services from Maricopa County, such as visits to her supervisory care home. Like many other CMI, however, Sitko preferred to be left alone and resisted treatment. One witness who visited Sitko testified that she seemed reasonably satisfied with her life and had no complaints about her living conditions. Another expert witness testified, however, that Sitko could benefit by "a strong commitment" from an adequate mental health system and rehabilitative psychosocial programming, perhaps even to the extent of putting her back into the workforce as a teacher. At the time of trial, Sitko was in her late 30s, living in a boarding home on Social Security disability payments.

## CLIFTON DORSETT

Clifton Dorsett was born June 30, 1915, in Bexley, Mississippi. He had only a fourth grade education and had worked since childhood. While working in a sugarcane factory he developed a silicosis-type lung disorder that prevented him from doing strenuous physical labor. His mental illness did not manifest itself until 1966, when he was committed to ASH for one year for the murder of his first common-law wife.

Dorsett was again committed to ASH in 1967. He spent the next 13 years in a locked ward. This commitment followed a Rule 11 determination of incompetency to stand trial for the murder and beheading of his second common-law wife (Maricopa County Superior Court No. CR–53352). Rule 11, Ariz.R.Crim.P., 17 A.R.S.

Dorsett was discharged from ASH following this 13–year commitment on January 14, 1981, and was placed under the guardianship of Nancy Elliston, owner of a private fiduciary service. At the time of his discharge, Dorsett was diagnosed as schizophrenic-paranoid type and was taking several different types of medication, some psychotropic and some for his lung condition.

Though she had considerable difficulty finding a home that would accept Dorsett, Elliston was finally able to place him in the Happy–Happy boarding home. Happy–Happy did not fully provide the quality of care Dorsett required; there were no doctors on staff, no locks on doors, no structured activities nor any supervision of residents' activities. Dorsett lived at Happy–Happy from January 1981 until March 1982, when Happy–Happy was closed. Until February 1984, Dorsett lived in three other boarding homes. His physical condition then deteriorated, and he was placed in Maricopa Medical Center Psychiatric Annex (the county hospital) for treatment. He died there on March 17, 1984, at age 68, seven months before the trial of this case.

## JOHN GOSS

John Goss, born February 19, 1936, was committed to ASH at the end of 1980, pursuant to a Rule 11 finding of incompetency to stand trial for bank robbery (Maricopa County Superior Court No. CR–112612). Rule 11, Ariz.R.Crim.P., 17 A.R.S. At the time of admittance, Goss complained of having constant headaches and of hearing voices. He said that he robbed the bank in order to return to institutional care. Goss had previously been admitted to ASH in 1971, 1972, 1973, and from 1974 to 1978.

Goss was honorably discharged from the Air Force in 1965, and until 1970 held jobs as a stockbroker, insurance salesman, welder and warehouse clerk. From 1970 until his death in 1984 he was unemployed.

Goss first became psychotic in 1967 at age 31. Hospital records described him as intelligent, quiet, and non-violent, but disheveled, lacking in socialization skills, and unable to comprehend even simple matters. His clinical diagnosis at his last discharge from ASH in early 1981 was chronic undifferentiated schizophrenia. Following this discharge, Goss was placed in a supervisory care home under the guardianship of the Maricopa County Fiduciary. ASH directed him to continue on medication and to receive health services from the community. According to his treating physician, Dr. John O'Steen, "[t]he treatment Goss received while living in the community was adequate to control his overt psychotic be-

havior, but no more was done for him. He was not socially integrated. He was an unhappy man. I never saw him interact with anyone else. He usually spent his time roaming around the streets of Phoenix, or sitting by himself at the boarding home.... He lived a miserable, lonely, isolated life." Goss died of heart failure at age 48, several months before trial of this case.

## RICHARD SCHACHTERLE

Richard Schachterle was born on May 10, 1952, and has suffered from chronic schizophrenia since his late teens. He graduated from a Yuma, Arizona, high school and received an associate of arts degree from Arizona Western College. He has no police record nor history of substance abuse, and has never been in a state mental hospital.

At the time of trial he was unemployed and living in a Phoenix boarding home. His sole source of income was Social Security disability payments. His medical care was covered through the Arizona Health Care Cost Containment System, and he received treatment through the Maricopa County Health Department's outpatient clinic.

In February 1980, Schachterle stopped taking his anti-psychotic drugs and suffered an acute psychotic episode. He was admitted to the county hospital and diagnosed as having a "schizophrenic reaction, paranoid-type, severe." During his relatively short stay, an examining physician described Schachterle in the following way: "The patient came in the office looking disheveled and frightened. He sat down and his lips were moving rapidly but he was mute. He stared at the examiner in a questioning gaze and then around the room.... He would get out a word or so but then would walk away, stop, think and look, and try to speak. He was attempting to be friendly."

Schachterle was discharged in March 1980 to the care of the A-1 Guest Lodge, with follow-up in the community. By fall 1984, Schachterle's condition had improved. He was able to dress himself, shave with an occasional reminder to do so, make his own bed, and eat regular meals. When asked, he would also perform simple chores for the boarding home. Most importantly, he had overcome his social withdrawal. He was socializing with other boarding home residents and had developed a very close relationship with the home's operator. Schachterle's guardian ad litem, Nancy Elliston, attributed his improvement to the care he received at the boarding home: "It appears [the boarding home operator] did this all by encouraging him and offering him cigarettes for good behavior and withholding cigarettes when necessary for inappropriate behavior. If Richard can change the amount that he has with that type of assistance, I think there is a very good potential for him with professional programs and treatment."

Despite this obvious improvement, the trial court found that Schachterle had previously functioned at higher levels than that at which he was functioning at the time of trial. The court noted that although he was unable to do so at the time of trial, Schachterle had previously carried on conversations, prepared meals, used public transportation, driven an automobile, and gone out without supervision. More importantly, the trial court found that Schachterle would function at a higher level if he were provided with appropriate mental health services.

## VI. THE MENTAL HEALTH SYSTEM IN THE STATE AND COUNTY

The statutes creating Arizona's mental health care system require, among other things, that DHS officials establish a statewide residential treatment program for the CMI and administer a unified mental health care system involving ASH and community programs. A.R.S. §§ 36–550.01(A) and 36–104(1)(c) (now see A.R.S. § 36–3403(B)(1)). Other statutes require counties to provide health care to the indigent sick. A.R.S. §§ 11–251(5) and 11–291(A).

The present system operating at the state and county levels, however, falls far short of an adequate system. In its findings of fact, the trial court describes the present mental health system. The parties agree with these findings, with the excep-

tion of ASH's role in discharge planning, which we shall discuss.

### A. In General.

Many CMI individuals in Maricopa County receive no mental health services at all. The public fiduciary testified, and the county acknowledged, that less than 1% of all CMI receive vocational services. Homeless CMI individuals stay in temporary shelters for extended periods of time because no residential programs are available. A lack of transportation prevents many class members from obtaining the few services that are available.

### B. The Current System.

Treatment of the indigent CMI residents of Maricopa County is supposed to be the coordinated responsibility of the Arizona Department of Health Services, the Arizona State Hospital and the Maricopa County Health Department. The three agencies, however, essentially operate independently. As a result, the present level of care that they provide to the CMI is tragically low.

#### 1. Arizona Department of Health Services (DHS).

DHS has the responsibility to lead in integrating, coordinating, and ensuring an adequate mental health system. The 1984 Behavioral Health Plan [3] reads in pertinent part:

*The department is the single state authority* as mandated by law, and therefore is responsible to take the lead in ensuring a state-wide *system of behavioral health services* through integration and coordination of its activities with those of other state departments, local governments, community behavioral

health programs, and public and private service providers.

(Emphasis in original.)

Experts at trial said, however, that the "system" is extremely fragmented, without leadership, lacking in cooperation, experiencing hostilities between the agencies, and suffering from neglect. In fact, one expert, Dr. Stewart Hollingsworth, director of Maricopa County's mental health hospital, said that there is "no system at all," and that what care exists is "chaotic."

#### 2. Arizona State Hospital (ASH).

Legislation requires ASH to be an integrated component of the mental health care system. *See* A.R.S. § 36–104(1)(c) (now see § 36–3403(B)(1)); §§ 36–204; 36–511. As part of that system, ASH is to prepare coordinated treatment plans and provide outpatient mental health services for discharged patients.

The record demonstrates, however, that ASH has failed to work with community agencies and has not functioned as an integrated component of the mental health system. ASH has a long history of refusing to negotiate interagency agreements with other components of the mental health system. The record establishes that the superintendent of ASH has often refused to sign such agreements, and that DHS has never enforced the requirement for agreements between community agencies and ASH.

ASH must provide treatment planning for discharged patients but has failed to do so. The state disputes this finding by the trial court, but the record supports it. ASH discharges patients with no plan for continuing care. They are sent into the community without medications, medical records necessary to provide appropriate treatment, or notification to any other agency prior to their discharge. Dr. Louisa Stark, former director of a Phoenix

---

3. This plan was developed by DHS in late 1983 and early 1984 at the request of then-Governor Bruce Babbitt to show how DHS would use existing funds and new appropriations in a revamped behavioral-health-services system. Under the plan, the state would be divided into geographic regions, with one administrative en-

tity receiving, and then handing out, behavioral-health funding for each region. The plan provided for funding of programs for the CMI among others. At the time of trial, DHS had designated the geographic boundaries and was seeking proposals from organizations that wanted to act as regional administrative entities.

shelter for the homeless, testified that discharged ASH patients had shown up at the St. Vincent de Paul temporary shelter wearing their hospital gowns. The record contains a litany of such horrors, but their numbers have failed to compel the mental health professionals to perform their statutory duty.

### 3. Maricopa County.

Maricopa County has the responsibility to provide adequate community mental health services including but not limited to case management, monitoring outreach, crisis services, and day treatment programs for all class members who would benefit.

Dr. Leonard Stein, an expert witness who evaluated Maricopa County's mental health care system, testified that the services provided are grossly inadequate and delivery of the extant services is fragmented. As a result, "patients are lost to the system."

Dr. Stein said that case management services, a clinically effective means of reducing rehospitalization and a fiscally responsible way to expend resources, were not being adequately provided by the county. He said that the Maricopa County readmission rate of 50 to 60 percent was a direct consequence of the lack of case management services. Ironically, Maricopa County was aware of the fiscal and clinical benefits of case management services; it conducted a study during 1979–82 that confirmed Stein's opinion and showed that an effective long-term case management program could save more than $2.5 million in the cost of inpatient hospital care.

The county's provision of outreach, crisis and day treatment services was found to be similarly deficient. One day treatment program director told Stein that her program actually could benefit 10 to 12 times the number of CMI patients enrolled.

### C. An Adequate System.

The trial court enumerated requirements for an adequate community mental health system. The system must provide a full continuum of care with each service available to all CMI individuals who would reasonably benefit therefrom. The first major precept of an adequate system is that the dollar follow the patient; that is, the funding received by the provider must be directly related to serving the patient in the community, thus discouraging unnecessary utilization of costly inpatient care.

A second major precept is that each CMI patient receives case management services to develop an individualized treatment plan and to monitor the patient's progress. Individualized treatment plans require a continuum of housing services, including group homes with 24–hour supervision; apartments with mental health professionals on-site; cooperative apartments with off-site, outreach teams; and independent living settings. Day treatment services must be available and must include life skills training, vocational training, socialization, and recreation. An adequate system must also include sufficient crisis stabilization beds and mobile crises teams of mental health professionals. An adequate system also must provide transportation to enable CMI individuals to reach appropriate services. Case managers, providers and family members must all be integrally involved with the CMI patient in formulating treatment and discharge plans.

Basically, all parties to this lawsuit concur on the benefits of an adequate system of care for the CMI.

## VII. TRIAL COURT ORDER

The trial court entered a detailed order requiring the defendants to provide community mental health services to *all* class members, as prescribed by law. The emphasis on "all" was in the original order. Specifically, the order mandates that defendants shall "fulfill their mandatory non-discretionary duties to *all* class members"; "provide a continuum of care for *all* class members"; and "provide a unified and cohesive system of community mental health care." Additionally, the court ordered defendants to "take any and all actions necessary for full implementation of this order including, but not limited to,

requests for funding and appropriations, if necessary." The order then set forth general and specific responsibilities of the three defendants for carrying out their statutory duties.

## VIII. ISSUES PRESENTED FOR REVIEW

A. Did the trial court exceed its special action jurisdiction thereby violating the separation of powers between the legislature, the executive, and the judiciary?

B. Did the trial court properly rule that the defendants have a mandatory, non-discretionary duty to provide community mental health services to the indigent CMI?

C. Did the trial court err in concluding that defendants breached a duty to provide community mental health services to the named plaintiffs?

1. Did ASH breach its legal duty when it failed to provide discharge plans to patients or their guardians?

2. Did Maricopa County breach its duty to provide community mental health services to the named plaintiffs?

3. Did defendants establish that it is impossible to provide comprehensive mental health services to all CMI?

D. Did the trial court correctly certify a class action brought on behalf of 4,500 individuals?

E. Did the trial court err in awarding attorney's fees to the plaintiffs?

## IX. LEGAL ARGUMENT

A. Did the trial court exceed its special action jurisdiction and violate the separation of powers between the legislature, the executive, and the judiciary?

The state claims that the trial court exceeded its special action jurisdiction and intruded into areas reserved for the legislative and executive branches of state government. The county claims that the judiciary has usurped the legislature's role, in violation of the separation of powers doctrine set forth in the first three articles of the Arizona Constitution.

■ We find no merit in the defendants' separation of powers argument. We hold that the trial court merely set forth in its order duties already mandated by the legislature. The trial court did not create duties for the defendants—it held that the legislature had created the duties. It is an appropriate judicial function to determine whether the legislature has created a duty and whether the duty has been breached. *Klostermann v. Cuomo*, 61 N.Y.2d 525, 475 N.Y.S.2d 247, 463 N.E.2d 588 (1984).

B. Did the trial court properly rule that the defendants have a mandatory, non-discretionary duty to provide community mental health services to the indigent CMI?

■ The trial court found that the Arizona legislature mandated by statute that DHS has primary responsibility for providing mental health services to all class members. A.R.S. §§ 36–102, 36–104(1)(c), 36–104(5), 36–104(16), 36–104(17), and 36–550. The trial court concluded that DHS must provide a full continuum of care for all class members, including, but not limited to: inpatient care, case management, residential services, day treatment, outreach, medications, outpatient counseling, crisis stabilization, mobile crises services, socialization, recreation, work adjustment, and transportation. The trial court found that, contrary to the mandates of the statutory design, DHS breached its duty to provide community mental health services to the plaintiff class.

The trial court further concluded that ASH has a mandatory non-discretionary duty under A.R.S. §§ 36–511(C) and 36–204 to the plaintiff class. The trial court found that the duty has been breached.

The trial court concluded that under A.R.S. §§ 11–251(5), 11–291(A), and 36–550 *et seq.* the county has mandatory non-discretionary duties to provide community mental health services to the plaintiff class. Again, the trial court found that the duty has been breached.

### 1. The State

The state, on behalf of DHS and ASH, contends that the legislature neither mandated nor intended to create the compre-

hensive system of community mental health services for all CMI individuals that the trial court ordered. Further, the state claims that the trial court judicially created duties never intended by the legislature. DHS, the state claims, has only limited duties under A.R.S. § 36–550 through § 36–550.08, the Community Mental Health Residential Treatment System.

A.R.S. § 36–550.01(A) states that DHS:

[s]hall establish a statewide plan for a community residential treatment system by July 1, 1983. Such plan shall provide for a statewide system of mental health residential treatment programs which provides to the chronically mentally ill a wide range of programs and services, as identified in § 36–550.05, as alternatives to institutional care.

The state argues that the legislature never intended that DHS's plan be self-executing and that the role of the state as an actual provider of services is limited. The state claims that the control of DHS's role as a provider of services rests with the legislature through its annual appropriations process and that DHS has never failed to use all funds appropriated for the "1057 program." A.R.S. § 36–550.03.[4]

The state also asserts that the trial court's construction of A.R.S. § 36–104 as creating a mandatory duty to provide a full continuum of mental health services to all the CMI is inconsistent with the limited scope of A.R.S. § 36–550.03. Because A.R.S. § 36–550 et seq. is both later in time and more specific than § 36–104, the state contends any inconsistency should be resolved by giving precedence to the more specific statute, citing *Anderson v. State*, 135 Ariz. 578, 663 P.2d 570 (App.1983). Additionally, the state maintains that A.R.S. § 36–550 et seq. is more specific and supersedes *all* other statutes pertaining to responsibilities of DHS.

DHS acknowledges that it is the authority mandated by statute to ensure a state-wide system of behavioral health services. The 1984 Behavioral Health Plan as set forth in part on p. 599, 775 P.2d p. 527, *infra*, requires that the Department lead a statewide system of behavioral health services through integration and coordination of its activities with other state departments, local governments, community behavioral health programs, and private providers.

The state also argues that the legislature has utilized the appropriations process to limit the scope of the mental health program, as it did in *Cochise County v. Dandoy*, 116 Ariz. 53, 567 P.2d 1182 (1977). *Dandoy* is inapplicable to this case. In *Dandoy*, the legislature refused to appropriate *any* funds for the Medicaid program. The court held that unless the legislature appropriates funds, the program cannot function. Here, however, the legislature has not refused to appropriate money to fund the mental health programs in Arizona. Quite the contrary; the legislature appropriates millions of dollars every year.[5] The record contains extensive testimony about how the money appropriated by the legislature could be put to the use required by the statutes. According to expert testimony, significant improvements could be made by reallocating existing funds. Based on the statutes and DHS's acknowledgement, we hold that the legislature has collectively imposed substantial legal duties on DHS to the plaintiff class.

We view the state's position on the issue before us as two-fold: first, that DHS has only limited duties pursuant to A.R.S. § 36–550 et seq.; and second, even if the duties are not limited, DHS could do nothing more than has been done because of limited funding. The second point we discuss later in this opinion.

As to the first point, where there is no inconsistency between general and specific statutes on the same subject, the statutes *must* be read together. *Anderson v. State*, 135 Ariz. at 584, 663 P.2d at 576

---

4. The Community Health Residential Treatment System created in 1981 is also known as the "1057 program" because it was created by Senate Bill 1057. DHS implemented its first 1057 program in July 1981.

5. Laws 1988, Ch. 9, § 1, subdiv. 24; Ch. 315, § 3.

(citing *Arden–Mayfair, Inc. v. State Dep't of Liquor Licenses and Control*, 123 Ariz. 340, 342, 599 P.2d 793, 795 (1979)). Because the trial court's legal conclusions are reviewable *de novo* by this court, we shall review all the statutes that pertain to DHS's responsibilities. *Polk v. Koerner*, 111 Ariz. 493, 533 P.2d 660 (1975).

The comprehensive statute establishing the state's general responsibility to provide indigent health care is A.R.S. § 36–104(17).[6] Other *general* statutes include A.R.S. § 36–102, establishing the Department of Health Services, and A.R.S. § 36–104(5), requiring the Director of DHS to provide a system of "unified and coordinated health services and programs between the state and county." A.R.S. § 36–104(16) requires the DHS director to promote effective utilization of "health manpower and health facilities which provide health care for the citizens of this state." These general statutes must be read and harmonized with all other health care statutes; otherwise, the result would be to render these general statutes superfluous. Well-accepted principles of statutory construction require that, whenever possible, the law must be given effect so that no clause or provision is rendered superfluous, void, contradictory or trivial. *State v. Superior Court for Maricopa County*, 113 Ariz. 248, 550 P.2d 626 (1976). We hold the general statutes to be in force and controlling upon the state.

We also hold that the *specific* statutes found at A.R.S. § 36–550 *et seq.* apply to the state in relationship to its duty to the plaintiff class, and that they are mandatory. DHS *must* provide a community residential treatment system that coordinates with all available treatment services and resources for the CMI in the community. A.R.S. § 36–104(1)(c) (now see A.R.S. § 36–3403(B)(1)) requires the assistant director of DHS to administer a system of:

> unified mental health programs, to include the functions of the state hospital and community mental health.

The statute is clear on its face. No contradictions exist within the statutory design.

The state and county both argued in post-trial motions that legislation enacted subsequent to the trial court's order changed their statutory obligations significantly. We do not agree. Much of the new legislation deals with planning and administrative issues rather than direct services to the CMI and is not germane to this appeal. The legislation does require DHS to set up pilot programs between July 1987 and September 1990 to study methods of delivering mental health services to the CMI. Laws 1986, Ch. 398, § 59. Only 500 of the 4,500 class members in Maricopa County are scheduled to receive services from these pilot programs during this three-year period. Laws 1986, Ch. 398, § 62. There is no evidence that the legislature intended these pilot programs to supersede an overall, comprehensive mental health system. The pilot program is experimental and an addition to the statutes upon which the trial court relied in its order. The details of the pilot program support the trial court's order. The pilot program is a means of experimenting with different methods of providing mental health services to the CMI. The pilot program and the general statutes are mutually supportive rather than contradictory. Legislative intent may be inferred both from the overall purpose of the statutory scheme and any subsequent enactments. *Perez v. Maricopa County*, 158 Ariz. 40, 760 P.2d 1089 (App.1988).

### 2. The County

The county's position is that it does not have a mandatory, non-discretionary duty to treat all CMI individuals, but rather a general duty to treat the indigent sick pursuant to A.R.S. § 11–251(5). The county points out that the statutes concerning its duty to provide health care are general in nature and do not refer to *mental* health care.

Division 2 of the Court of Appeals has held that A.R.S. § 11–291 imposes upon the

---

**6.** The statute requires the DHS director to "[t]ake appropriate steps to provide health care

services to the medically dependent citizens of this state."

county "the sole and exclusive authority to provide for the hospitalization and medical care of the indigent sick in the county." That court held this to be a mandatory duty. *Perez v. Maricopa County*, 158 Ariz. at 41, 760 P.2d at 1090 (citing *Hernandez v. County of Yuma*, 91 Ariz. 35, 36, 369 P.2d 271, 272 (1962)).

The county further claims that the more specific statutes in Title 36 control the general ones in Title 11. Title 36 specifically provides that the state must furnish services or contract to provide services for the CMI. Contracts may be with counties or non-profit agencies. A.R.S. § 36–550.02 states that counties are responsible only for developing an individual county profile of existing programs. The county believes this is a minor role that does not indicate the county should be responsible for CMI programs as a whole. Furthermore, the county claims that the *general* nature of the indigent health care statutes does not render them appropriate for declaratory relief.

The county argues that the statutes relied on by the trial court, A.R.S. §§ 11–251(5) and 11–291(A), do not mention mental illness or chronic mental illness and therefore create no duty on the part of the county to the CMI. The county relies on the Pennsylvania case of *In re Schmidt*, 494 Pa. 86, 429 A.2d 631 (1981), for the proposition that its duty to the mentally ill is very limited in nature. We find the case neither helpful nor persuasive. The issue in *Schmidt* was which governmental unit— county or state—had the responsibility to assume the initiative in developing appropriate placement for a mentally retarded individual. The decision was based on Pennsylvania statutes relating to the mentally retarded that are quite different than the Arizona statutes before us.

We hold that A.R.S. §§ 11–251(5) and 11–291(A) mandate that the county provide mental health services to the CMI class. The county's duty under the statutes to provide medical care for the indigent sick includes a duty to provide community mental health services to the indigent chronically mentally ill. Legislation subsequent to

the trial court's order removes any doubt as to the legislative intent. Although the pilot program terminates in 1990 pursuant to Laws 1986, Ch. 398, § 72, A.R.S. § 36–3403(B)(1) continues to mandate a unified mental health program that includes the county. All of the statutes relied upon by the trial court were specifically exempted from the sunset provision of Laws 1986, Ch. 398, § 72. We agree with the plaintiffs that the statutes, when read together, create complimentary duties of the state and county that are mutually supportive rather than inconsistent. *See Bellino v. Superior Court*, 70 Cal.App.3d 824, 829, 137 Cal. Rptr. 523, 526 (1977).

C. Did the trial court err in concluding that the defendants breached a duty to provide community mental health services to the named plaintiffs?

█ The parties all agree that the five named plaintiffs were chronically mentally ill. They all agree that plaintiffs Goss, Dorsett, Sitko, and Burch each had been hospitalized at both ASH and the county hospital. Plaintiff Schachterle had been hospitalized at the county hospital, but not at ASH. All plaintiffs had received psychiatric outpatient services from the county.

The defendants argue that the five named plaintiffs had reached the highest level at which they were capable of functioning. Moreover, the defendants claim that the plaintiffs expressly declined further mental health services. The county says in its brief that "forcing services on patients who do not want them, raises questions which are more of a philosophical or moral nature than a legal nature." The state claims that the evidence showed that ASH has provided discharge plans for the named plaintiffs and for CMI individuals generally, but that the state and ASH have no duty to provide outpatient care.

The trial court found that the named plaintiffs have not received all of the community mental health services from which they would benefit. Following discharge from ASH and the county hospital, Mr. Goss received outpatient services amounting only to a medication review of 10 to 15 minutes per month. Mr. Dorsett was hos-

pitalized at ASH for 13 years. ASH did not provide him with adequate discharge plans. Although ASH knew Mr. Dorsett was a potential hazard to the community, ASH discharged him to a boarding home that did not provide the constant supervision and assistance with medication that his condition required. Mr. Schachterle, in the past, functioned at a much higher level than he was functioning at the time of trial. At the time of trial he lived at the A-1 Guest Lodge run by untrained staff. Ms. Sitko, a college graduate fluent in three languages, was living in a monotonous setting with no trained mental health professionals. ASH had dropped her from its tracking system. Mr. Burch also did not receive an adequate discharge plan from ASH and was hospitalized longer than necessary because adequate community care did not exist. Once back in the community, ASH failed to track him and he did not have adequate care to enable him to function on an appropriate level.

The state does not dispute any of the trial court's findings with respect to lack of treatment or services for the five named plaintiffs. The state, therefore, has waived this issue. *DeElena v. Southern Pac. Co.*, 121 Ariz. 563, 592 P.2d 759 (1979).

The county disputes these findings and argues that the five named plaintiffs were appropriately treated. Our review of the record reveals that none of the trial court's findings on this issue is contrary to the evidence. *Polk v. Koerner, supra.* We shall not substitute our judgment for that of the trial court. *Petefish By and Through Clancy v. Dawe*, 137 Ariz. 570, 672 P.2d 914 (1983); *Harris Cattle Co. v. Paradise Motors, Inc.*, 104 Ariz. 66, 448 P.2d 866 (1968).

1. ASH breached its legal duty when it failed to provide discharge plans to patients or their guardians.

The state claims that ASH has fulfilled its duties under A.R.S. § 36-511(C), arguing that the evidence does not support the trial court's findings and that we should review the matter *de novo*. It claims the Center presented no evidence that the plaintiffs' guardian or the plaintiffs ever complained to the state about the lack of discharge plans. The failure of the CMI to complain, however, cannot negate ASH's statutory duty to provide adequate discharge plans for each patient to the patient or patient's guardian sufficiently in advance of discharge to constitute notice. The record contains sufficient evidence to support the trial court's finding of a breach of duty by ASH in the failure to timely provide adequate discharge plans. *Whittemore v. Amator*, 148 Ariz. 173, 713 P.2d 1231 (1986).

2. The county breached its duty to provide community mental health services.

Our review of the record once again reveals sufficient evidence to support the trial court's findings. The county has a duty to provide community mental health care services to the plaintiff class. A.R.S. §§ 11-251(5) and 11-291(A). Legislative history reveals an intent to coordinate program planning and development at the county level. Laws 1980, Ch. 227, §§ 1(5), 2(2), 2(4). Testimonial evidence coupled with the county's position that it had no duty to provide services demonstrates that the county breached its duty to the CMI. We affirm the order of the trial court that the county must provide community mental health treatment and services to the plaintiff class.

3. The defendants failed to establish that it is impossible to provide comprehensive mental health services to all CMI.

Defendants argue that, even if a duty exists and even if that duty was breached, the breach was justifiable because lack of funds rendered the duty impossible to perform. At the oral argument it became clear that this issue is not before us at this time as it is not ripe for our review. The parties did not present any direct evidence to the trial court that performance was impossible due to lack of funds. The trial court was deciding only whether the state and county have a duty to provide mental health care for the CMI and whether that duty had been breached. In that respect this case is similar to *Harrison v. Riddle*, 44 Ariz. 331, 36 P.2d 984 (1934). In an

action to compel racial segregation in public schools, this court held:

It is a general rule that a want of funds or means of obtaining them is a ground for denial of the writ as its issuance will be unavailing. 18 R.C.L. 227, § 151; 38 C.J. 556, § 28. But this is not an action to compel defendants to draw their warrant or warrants to pay the expenses of segregation, but an action to compel segregation and to provide accommodations made necessary thereby— "an act which the law specially imposes as a duty resulting from" defendants' office of trustee. Section 4396, Rev. Code 1928. If and when the question of paying the expenses of segregation ever arises, the defense of inability to pay them because of lack of funds or means of obtaining them might well be interposed, but not under the facts of this case.

44 Ariz. at 335, 36 P.2d at 986.

The trial court in this case ruled that the defense of impossibility was never factually established at trial. We affirm. *State v. Angle,* 54 Ariz. 13, 91 P.2d 705 (1939); *Carr v. Frohmiller,* 47 Ariz. 430, 56 P.2d 644 (1936).

D. Did the trial court correctly certify a class action brought on behalf of 4,500 individuals?

■ We must determine the appropriateness of bringing a special action as a class action. Despite an earlier pronouncement to the contrary, we decide today that a special action may be litigated as a class action. We look first to *Town of Chino Valley v. State Land Dep't,* 119 Ariz. 243, 580 P.2d 704 (1978) and a subsequent decision in *Clark v. State Livestock Sanitary*

*Bd.,* 131 Ariz. 551, 642 P.2d 896 (App.1982) that relate to this issue.

In *Chino Valley* we held that a special action challenging amendments to the Groundwater Code would not be certified as a class action, noting the absence of express authorization in the Rules of Procedure for Special Actions. We distinguish *Chino Valley* from the case before us as *Chino Valley* was an original jurisdiction case filed directly with this court and not an appeal from a special action filed in the superior court. Ariz. Const. art. 6, § 5(1). The supreme court has original jurisdiction of extraordinary writs to state officers. Unlike this court, the trial court has the ability to carry out those procedural steps necessary for certification of a special action. *See* Rule 2, Ariz.R.P.Sp.Act, 17B A.R.S.; Rule 23, Ariz.R.Civ.P., 16 A.R.S.

Additionally, the parties in *Chino Valley* paid only cursory attention to the special action/class action issue, so it was in no way fully and adequately briefed.[7] Therefore, we believe that *Chino Valley* applies only to original jurisdiction special actions filed in appellate courts.

Several justifications exist for allowing special actions in the superior court to proceed as class actions. First, nothing in the Rules of Procedure for Special Actions intimates that class actions are impermissible. Our basis for concluding in *Chino Valley* that special action/class actions could not be maintained was that the special action rules contained nothing that specifically *permits* such litigation. 119 Ariz. at 246, 580 P.2d at 707. We think the more appropriate way to view the issue in the present context, considering that class actions are allowed in mandamus actions in other courts, is whether the special action rules

---

7. The issue literally received only cursory attention. In their petition for special action, the *Chino Valley* petitioners merely stated that they:

bring this action on behalf of themselves and other persons, corporations, or other legal entities too numerous to make it practical to bring all before the Court, all of whom constitute a class similarly situate [sic] and to all of whom there is a common question of law affecting their several rights and the common relief herein sought, and will hereinafter be referred to as Petitioners.

There was no discussion of whether the petitioners legally could be organized as a class to begin with; they jumped to step two, which was deciding whether they complied with the class-action-certification rule.

The respondents also did not address the threshhold issue of whether the petitioners, regardless whether they could be certified, even could organize as a class action. The respondents only objected to a class action because they claimed that the petitioners were not similarly situated.

indicate such litigation is impermissible. *Mountain States Tel. & Tel. Co. v. Arizona Corp. Comm'n*, 160 Ariz. 350, 773 P.2d 455 (1989). Rule 2, Rules of Procedure for Special Actions, 17B A.R.S., grants judges discretion in determining the parties to a special action; in fact, rule 2(b) allows judges to "order [other persons'] joinder as parties...." This is essentially what happens when a trial judge certifies a class action. *See generally* Rule 23, Ariz.R. Civ.P., 16 A.R.S.

Second, class actions are accepted vehicles in other states and in the federal courts in actions for mandamus relief. *See, e.g., Elliott v. Weinberger*, 564 F.2d 1219 (9th Cir.1977), *aff'd sub nom. Califano v. Yamasaki*, 442 U.S. 682, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979); *Lowry v. Obledo*, 111 Cal.App.3d 14, 169 Cal.Rptr. 732 (1980); *Watterson v. Miller*, 117 Ill.App.3d 1054, 73 Ill.Dec. 513, 454 N.E.2d 373 (1983); *Turner v. Reed*, 52 A.D.2d 739, 382 N.Y. S.2d 391 (1976). Arizona maintains the essence of the writ of mandamus within the special action as stated explicitly in Rule 1 of the Rules of Procedure for Special Actions, and art. 6, § 5 of the Arizona Constitution. Ample authority exists that those states that continue to have mandamus allow class actions, apparently without reserve, provided that the plaintiffs comply with the class action rules. Based on this, we find no reason Arizona should not allow special action/class actions in *the trial court.*

Third, we find persuasive New York's position on this issue. Arizona followed New York's lead in consolidating the extraordinary writs into the special action. *See* note to Rule 1, Ariz.R.P.Sp.Act, 17B A.R.S. New York courts have held that nothing in their special action rules precludes the bringing of special actions as class actions. *Young v. Shuart*, 67 Misc.2d 689, 325 N.Y.S.2d 113 (1971).

Finally, our citizens must be allowed to maintain a class action so they will have appropriate access to the judicial system. Mandamus—special action—is the proper avenue for compelling public officials to perform non-discretionary acts. *State v.*

*Phelps*, 67 Ariz. 215, 193 P.2d 921 (1948). The petitioners in this special action could not obtain relief if they could not proceed by a special action sounding in mandamus. If we preclude them from bringing a class action here, we have effectively shut off a procedural avenue to the court.

We have interpreted the Arizona Constitution as requiring equal access to justice regardless of the plaintiff's financial status. *Hampton v. Chatwin*, 109 Ariz. 98, 505 P.2d 1037 (1973). Our constitution states:

> Section 13. No law shall be enacted granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations.

Ariz. Const. art. 2, § 13. In *Hampton*, we held that, based on our constitution, an indigent must be allowed to seek waiver of an appeal bond when appealing a justice court decision to the superior court. Likewise, we have invalidated a statute as violating the constitutional privileges and immunities clause because it specifically did not allow for waiver of a cost bond. *Eastin v. Broomfield*, 116 Ariz. 576, 570 P.2d 744 (1977). Not allowing the bond to be waived denied the indigent access to the courts. *Id.* at 586, 570 P.2d at 754.

We find the same type of barrier in this case. The 4,500 indigent CMI petitioners could not bring individual special actions to compel the state and county to provide them with adequate mental health care. Because a special action sounding in mandamus is their remedy, they must be allowed to maintain a class action to pursue their goals. The state constitution and practical considerations of judicial economy require it.

■ We reject the defendants' contention that special actions, by their very nature, should preclude class actions. A court can maintain the narrow focus required by a special action regardless of the number of petitioners seeking relief. *See e.g. United States v. Superior Court*, 144 Ariz. 265, 697 P.2d 658 (1985). Furthermore, we find no merit in the state's argu-

ment that the trial court abused its discretion in certifying the class due to the fact that each class member has an individualized need. The plaintiffs met the typicality requirement. We affirm the trial court's certification of the class.

E. Did the trial court err in awarding attorney's fees to the plaintiffs?

■ The trial court awarded attorney's fees to the prevailing party pursuant to A.R.S. § 12–348. The state does not contest that A.R.S. § 12–348(A)(5) applies to this case. The statute provides for an award of attorney's fees in a special action proceeding brought by the party to challenge an action by the state against the party. The state argues, however, that the statute contains a limitation that the trial court failed to apply.

The trial court awarded the fees based on prevailing market rates. A.R.S. § 12–348(D)(2) reads:

D. The court shall base any award of fees as provided in this section on prevailing market rates for the kind and quality of the services furnished, except that:

. . . .

2. The award of attorney's fees may not exceed the amount which the prevailing party has paid or has agreed to pay the attorney or a maximum amount of seventy-five dollars per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceeding involved, justifies a higher fee.

The state argues that this statute requires an actual agreement to pay. *Alano Club 12, Inc. v. Hibbs*, 150 Ariz. 428, 724 P.2d 47 (App.1986). Here no agreement to pay exists because the Center pursued this matter *pro bono*. The state asks that if the Center does prevail the award should be limited to the actual costs of litigating the case rather than a "fictitious prevailing rate." The state compares A.R.S. § 12–341.01(B), providing for reasonable attorney's fees in contract litigation, and then cites several cases under the former statute limiting contract action attorney's fees to the actual

fee arrangement. *See, e.g., Associated Indem. Corp. v. Warner*, 143 Ariz. 567, 570, 694 P.2d 1181, 1184 (1985). The trial court, however, found that it was not bound by the limitations of A.R.S. § 12–348(D)(2) because of the existence of a special factor: the limited availability of qualified attorneys to provide representation.

We agree with the trial court. The plaintiffs are entitled to attorney's fees pursuant to A.R.S. § 12–348. Attorney's fees should not be limited by the fact that the plaintiffs are indigent and that their attorneys accepted the case on a *pro bono* basis. It would be a paradox to hold that litigants who are able to pay will have their attorney's fees reimbursed while attorneys who represent litigants unable to pay will be forced to remain unpaid. Such a result would be contrary to the legislative intent in enacting A.R.S. § 12–348. Laws 1981, Ch. 208, § 1. *Alano Club 12*, relied upon by the state, is not applicable as it turns on the question of whether an attorney-client relationship even existed. There was evidence before the trial court to support a determination that no attorneys other than the Center would have undertaken this case. The evidence justifies the trial court's decision to pay fees at the market rate rather than the statutory rate. The reasoning of the United States Supreme Court supports this decision, even though a federal statute was involved. *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).

We believe this case meets the criteria of superior quality of service and exceptional success justifying the trial court's award. *London v. Green Acres*, 159 Ariz. 136, 765 P.2d 538 (1988); *see also Skelton v. General Motors Corp.*, 860 F.2d 250 (7th Cir. 1988); *Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516 (D.C.Cir.1988). The attorney's fees here should be calculated according to prevailing market rates, regardless of the fact that plaintiffs are represented by non-profit counsel. *Blum v. Stenson*.

The trial court held the county responsible for one-third of the fee award under the "private attorney general doctrine,"

also known as the "substantial benefits doctrine." In *State v. Boykin*, 112 Ariz. 109, 114, 538 P.2d 383, 388 (1975), we recognized the existence of a "private attorney general doctrine" that allows an award to a prevailing plaintiff for vindicating an important public policy, but found it inapplicable there. The county claims the trial court erred in awarding fees against it under this theory. There are no Arizona cases awarding fees under the "private attorney general doctrine." *See Roe v. Arizona Bd. of Regents*, 23 Ariz.App. 477, 534 P.2d 285 (1975), *vacated on other grounds*, 113 Ariz. 178, 549 P.2d 150 (1976).

The Center relied upon *Serrano v. Priest*, 20 Cal.3d 25, 569 P.2d 1303, 141 Cal.Rptr. 315 (1977), to justify the award. The county attempts to distinguish *Serrano* because its holding was restricted to the vindication of a public policy having a constitutional rather than statutory basis. This is incorrect. *In re Head*, 42 Cal.3d 223, 227, 721 P.2d 65, 67, 228 Cal.Rptr. 184, 185–86 (1986) (California statute creating right to attorney's fees applies to actions vindicating statutory as well as constitutional rights).

The "private attorney general theory" or the "substantial benefits doctrine" has been recently discussed by Arizona courts. *Kadish v. Arizona State Land Dep't*, 155 Ariz. 484, 747 P.2d 1183 (1987), *petition for cert. granted*, — U.S. —, 109 S.Ct. 217, 102 L.Ed.2d 208 (1988); *Roe v. Arizona Bd. of Regents, supra; Sleeseman v. State Bd. of Educ.*, 156 Ariz. 496, 753 P.2d 186 (App. 1988); *Matter of Estate of Brown*, 137 Ariz. 309, 312, 670 P.2d 414, 417 (App. 1983). In *Kadish*, Justice Feldman and Chief Justice Gordon expressed support for the doctrine. They declared that "courts have inherent equitable power to award fees, notwithstanding the 'American Rule....'" 155 Ariz. at 497, 747 P.2d at 1196 (citing *Hall v. Cole*, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973)).

The private attorney general doctrine is an equitable rule which permits courts in their discretion to award attorney's fees to a party who has vindicated a right that:

(1) benefits a large number of people;
(2) requires private enforcement; and
(3) is of societal importance.

Comment, *Important Rights and the Private Attorney General Doctrine*, 73 Calif. L.Rev. 1929 (1985). The purpose of the doctrine is "to promote vindication of important public rights." Comment, *Equitable Attorney's Fees to Public Interest Litigants in Arizona*, 1984 Ariz.St.L.J. 539, 554.

■ Although Arizona has long recognized the private attorney general doctrine, we have not applied it before. We do so now.

Whether to adopt the private attorney general doctrine involves a policy choice between encouraging public interest litigation and preserving the "American Rule" of each party bearing its own attorney's fees absent a statute or contract directing otherwise. The "American Rule", although longstanding, has been eroded by statute and by judicial decision on both the state and federal level. In Arizona, we have at least 73 statutes providing for fee-shifting. *See, e.g.*, A.R.S. § 12–348 (award of fees and other expenses against the state, or a city, town, or county). There are a number of judicial exceptions to the "American Rule" such as the Common Fund Doctrine. *Steinfeld v. Zeckendorf*, 15 Ariz. 335, 138 P. 1044 (1914), *aff'd*, 239 U.S. 26, 36 S.Ct. 14, 60 L.Ed. 125 (1915). Given the eroded status of the "American Rule" and the benefit to Arizona citizens from public interest litigation, we adopt and apply the private attorney general doctrine here.

## X. CONCLUSION

It has been stated that "[t]he moral test of government is how it treats those who are in the dawn of life, the children; those who are in the twilight of life, the aged; and those who are in the shadows of life, the sick, the needy and the handicapped."[8] Arizona has imprisoned its CMI in the shadows of public apathy. The legislature was the first to speak on the issues before

8. Hubert Horatio Humphrey (1911–78), as reported in *Newsweek*, p. 23, Jan. 23, 1978.

us. We find no evidence in this record that the legislature intended to pass sham legislation. The legislature thoroughly, carefully and completely mandated duties of the state and county to the CMI population in Arizona. We hold that the legislature has mandated that the state and the county have a duty to jointly and harmoniously provide mental health care to the plaintiff class. In so holding we note that the duty may well be more expensive in the breach than in the fulfillment. (*See* Appendix)

The trial court found that the duty existed and that the duty has, thus far, been breached. We affirm the judgment of the trial court and the award of attorney's fees.

FELDMAN, V.C.J., and CAMERON and MOELLER, JJ., concur.

Chief Justice FRANK X. GORDON, Jr. did not participate in this decision; pursuant to Ariz. Const. art. 6, § 3, Chief Judge Sarah D. Grant of the Court of Appeals, Division One, was designated to sit in his stead; Justice William Holohan retired before the decision of this case; Justice Robert J. Corcoran did not participate in the determination of this case.

APPENDIX

The following sampling will give an idea of the cost to society of an inadequate mental health care system:

*State v. Johnson*, 156 Ariz. 464, 753 P.2d 154 (1988): The defendant, a long-time victim of severe mental illness, was found not guilty by reason of insanity. From the onset of his disease he led a nomadic life interrupted by frequent hospitalizations after episodes of bizarre behavior. After being medicated and stabilized in the hospital he would typically relapse upon release. He was twice hospitalized at ASH. Upon his second release, failing to obtain outpatient treatment or medication, he again relapsed with tragic consequences. Two months after release he beat his arthritic, wheelchair-bound neighbor to death with a tire iron. Upon the verdict of not guilty by reason of insanity, Johnson was again committed to ASH. As a result of a hearing pursuant to A.R.S. § 13–3994, the trial court ordered his release from ASH on a conditional basis. The case came to us because "[t]he state had difficulty finding a facility which would accept Johnson under the terms of the conditional release order."

*State v. Coconino County Superior Court, Div. II*, 139 Ariz. 422, 678 P.2d 1386 (1984): Mauro, the real party in interest, had a long history of mental disorders. He unsuccessfully tried to kill his pregnant wife, and believing he had killed her, he attempted suicide. Ultimately he killed his small son by stuffing a sock and soiled diapers down the child's throat after locking him in a bathroom for three days. *See also State v. Mauro*, 149 Ariz. 24, 716 P.2d 393 (1986), *rev'd sub nom. Arizona v. Mauro*, 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987), on remand *State v. Mauro*, 159 Ariz. 186, 766 P.2d 59 (1988).

*Cooke v. Berlin*, 153 Ariz. 220, 735 P.2d 830 (App.1987): Tanya Robinson, a 22-year-old University of Arizona student, sought help for mental problems at Southern Arizona Mental Health Center (a state facility). She was diagnosed and put on medication but did not follow through with treatment. As a result of her mental disorder, she developed a delusion which led her to kill a Tucson disc jockey whom Robinson believed was observing her through her radio.

*Hamman v. County of Maricopa*, 161 Ariz. 58, 775 P.2d 1122 (1989): John Carter was treated in the emergency clinic of the county hospital where he was taken by his concerned and frightened parents. He was admitted to the hospital and medicated. Upon his release 16 days later, he was given directions to continue taking the medication. The parents were not informed of his release. After many days of bizarre behavior, the parents took Carter back to the county hospital. He spent 30 minutes in the crisis center and was released with prescriptions. Two days later Carter attacked his stepfather

by beating him over the head with wooden dowels. The stepfather suffered a heart attack during the beating as well as severe brain damage as the result of blows to the head. Carter was found not guilty of assault by reason of insanity.

*State v. McPherson*, 158 Ariz. 502, 763 P.2d 998 (App.1988): Malcolm McPherson was charged with armed residential burglary and theft, both dangerous felonies, for breaking into an unoccupied house and taking food, clothing and a rifle. The offense occurred just one week after McPherson discharged himself from self-commitment at ASH. He was found incompetent to stand trial and was committed to ASH in November 1986. He was released from ASH, and in March 1987 a bench warrant issued for his arrest. He was placed back in the Coconino County Jail where he refused certain psychotropic medications and quickly deteriorated. McPherson was once again found incompetent to stand trial and was readmitted to ASH in April 1987. By September 1987, his doctors declared him competent to stand trial and discharged him from ASH back to the county jail. Once again his condition deteriorated and in December 1987 he was recommitted to ASH for treatment. Examining physicians agreed that McPherson's condition could not be treated by simply placing him on medications while in jail; he needed a total therapeutic environment. The charges were ultimately dismissed. McPherson is a classic example of the revolving door syndrome that characterizes the treatment of CMI.